773 A.2d 1081

Charles David UTTER

v.

STATE of Maryland.

No. 113, Sept. Term, 2000.

Court of Special Appeals of Maryland.

June 6, 2001.

Amy E. Brennan, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Joseph I. Cassily, State's Atty. for Harford County of Bel Air, on the brief), for appellee.

Submitted before DAVIS, DEBORAH S. EYLER and PAUL E. ALPERT (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

Charles David Utter, the appellant, was convicted by a jury in the Circuit Court for Harford County of attempted first degree rape, attempted second degree rape, first degree burglary, and third degree burglary. The court sentenced him to

50 years in prison, all but 30 years suspended, for the attempted first degree rape conviction. It imposed a sentence of 20 years in prison, to be served consecutive to the 30–year sentence, for the first degree burglary conviction. The other sentences were merged.

On appeal, the appellant presents the following questions for review:

I.   Did the trial court err by refusing to allow him to call a defense witness?

II.  Did the sentencing court err in imposing separate, consecutive sentences for the first degree burglary and attempted first degree rape convictions?

For the following reasons, we answer the first question "No," and the second question "Yes." Accordingly, we shall vacate the appellant's 20–year sentence for first degree burglary; otherwise, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

On the night of August 21, 1998, a man broke into Christine M.'s house and attempted to rape her. When the crimes occurred, Christine was 14 years old and was living with her father in Edgewood, Maryland. Her best friend, Melissa, and Melissa's parents lived around the corner from Christine. Melissa's uncle, the appellant, lived in the house next door to Melissa.

On the day in question, Christine and Deborah Preisinger, Christine's neighbor from across the street, visited Christine's mother in a nursing home. They returned to Ms. Preisinger's house and had dinner. At about 11:00 p.m., Christine walked across the street to her house. No one was there because Christine's father had thought (mistakenly) that she would not be home that night.

Christine changed into a nightshirt and shorts and went to bed. As she was lying in bed about to fall asleep, she heard her bedroom door open, and felt someone climb across her

bed. At first, she thought that her father had come home and had come into her room to say goodnight. When the person who had climbed across the bed covered her mouth and flipped her over, Christine realized that he was not her father.

The man threatened to kill Christine if she screamed, started kissing her and sucking her neck, and then made her remove her shorts. He attempted to have intercourse with her, without success. His penis touched her vaginal opening during that attempt. Christine cried, tried to get away, and bit the man. The man attempted to have intercourse with her at least three more times. When Christine managed to put her feet on the man's chest and push him away, he left.

Christine did not get a clear view of her assailant, but she was able to describe him as having long hair and being "kind of skinny." The light in the hallway permitted her to see the side of his face as he left the room. At that time, she thought the man was the appellant.

As soon as the man left, Christine called Melissa, who was not home, and spoke to Melissa's mother and told her what had happened. Melissa's mother called the police; she and her husband then drove to Christine's house, and were present when the police arrived. The police took possession of the clothing that Christine had been wearing.

Christine was taken to the hospital and examined. She was found to have two bruises on her neck, but no other trauma. No evidence of semen was found.

The police collected Christine's bed linens and dusted areas of the house for fingerprints. They discovered that a window screen had been cut out of one of the windows in the house. According to Christine, the screen had not been in that condition when she got into bed on the night of the assault. The window had been left open, however.

When the police interviewed Christine on the night of the assault, she did not identify her assailant. Two days later, she called the detective who had interviewed her and told him she believed that the appellant was the person who had "been in

her house." The police then obtained a search warrant that authorized them to take blood and hair samples from the appellant.

Christine's bed sheet and nightshirt were found to have semen on them. DNA testing of those items and of the known samples of blood from the appellant established: 1) that with respect to the bed sheet, the probability of selecting an unrelated individual at random from the Caucasian population was one in 160 million, and from the African–American population was one in 1.5 billion; and 2) with respect to the nightshirt, that probability for a Caucasian was one in 2.3 million and for an African American was one in 11 million.[1] No other forensic evidence tied the appellant to the crime, however.

At the appellant's trial, Melissa testified that on the night in question she had been with the appellant and with other family members, including her mother, at an aunt's house. At about 11:20 p.m., they drove the appellant home but dropped him in the driveway next to his house because he did not want to go home. He had been drinking heavily and was saying words to the effect that he wanted to find someone to have sex with. Melissa also testified that the appellant had expressed a sexual interest in Christine in the past.

Melissa's mother corroborated Melissa's testimony and stated that, sometime between 11:00 and 11:30 p.m., she saw someone that she thought was the appellant riding a bicycle past her house toward the street on which Christine lived. She further testified that when she went to Christine's house after receiving her telephone call, Christine was upset and crying, and gave a description of her assailant that fit that of the appellant, although she did not identify him.

Christine testified for the State, as did Deborah Preisinger; the emergency room nurse who examined Christine; two police detectives who participated in the investigation; and two forensic DNA experts.

---

1. The appellant is Caucasian.

The appellant testified on his own behalf. He denied entering Christine's home on the night in question or any involvement in the attack on her.

Additional facts will be recited in our discussion of the issues.

## DISCUSSION

### I

In an effort to counter the DNA "match" evidence, the appellant testified about a possible explanation for the presence of his semen on Christine's nightshirt.

The appellant stated that he knew Christine because she was friends with his niece Melissa and that he had "played with her sometimes, we kidded around, water fights, mud fights, wrestling around." One day in the last week of July (about three weeks before the attempted rape), at about 4:30 or 5:00 p.m., the appellant was walking his dog through backyards in the neighborhood when he saw Christine sitting on her back porch. She called out to him and asked for a cigarette. He walked up to the back porch and gave her his pack of cigarettes. She took a cigarette but held onto the pack. When he asked for it back, she started "playing around" with him, like they had before, and then grabbed his penis. She started to masturbate him and there was an emission of semen. When this incident occurred, Christine was wearing a baggie tee-shirt. The appellant could not say whether the tee-shirt that Christine was wearing that day was the same nightshirt that she was wearing on the night of the attempted rape and that had been found to contain his semen.

After the appellant finished testifying, defense counsel approached the bench and told the court that he wanted to call Ms. Preisinger (who already had testified for the State). He proffered that Ms. Preisinger would testify that shortly after the attempted rape, she had spoken with Christine and had told her that she knew that Christine offered sexual favors in exchange for cigarettes; and that when she said that to

Christine, Christine remained silent and looked away. Defense counsel argued that that testimony constituted an admission by silence on Christine's part that would "tend[ ] to support the cigarette incident in the back yard that [the appellant] just testified to."

The State objected to the proffered testimony, and the trial court ruled it inadmissible, under the Maryland Rape Shield Law. Later in the trial, the court explained in detail the reason for its ruling:

I think it's clear [the proffered testimony] doesn't satisfy the conditions, any one of the four conditions which are necessary for me to determine whether or not the evidence should be admitted, and that is: It doesn't refer to the defense of past sexual conduct with the defendant; the testimony of Miss Preisinger does not indicate there is any evidence of any specific instance of sexual activity showing the source of the semen or such; it's not evidence which supports any claim that the victim has an ulterior motive; and it's not evidence which is offered for the purpose of impeachment. The prosecutor did not put the victim's past or prior sexual conduct in issue, so it doesn't meet those criteria, without even getting to the balancing of the probative versus prejudicial.

The appellant contends that the trial court's ruling was in error because the proffered testimony of Ms. Preisinger was admissible under the Rape Shield Law and, if it was not, he nevertheless had a constitutional right to present the testimony in his defense.

The Maryland Rape Shield Law, Md.Code (1957, 1996 Repl. Vol. & 2000 Supp.), art. 27, § 461A, provides, in relevant part:

(a) *Evidence relating to victim's chastity.*—Evidence relating to a victim's reputation for chastity . . . [is] not admissible in any prosecution for . . . attempted rape. . . . Evidence of specific instances of the victim's prior sexual conduct may be admitted only if the judge finds the evidence is relevant and is material to a fact in issue in the case and that its

inflammatory or prejudicial nature does not outweigh its probative value, and if the evidence is:

(1) Evidence of the victim's past sexual conduct with the defendant; or

(2) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma; or

(3) Evidence which supports a claim that the victim has an ulterior motive in accusing the defendant of the crime; or

(4) Evidence offered for the purpose of impeachment when the prosecutor puts the victim's prior sexual conduct in issue.

The trial court allowed the appellant to testify about the alleged incident in Christine's backyard under subsection (a)(2) of the Rape Shield Law, as evidence of a specific instance of sexual activity showing the source of semen. The appellant argues that the proffered testimony of Ms. Preisinger was admissible under the same subsection of the Rape Shield Law in that it corroborated his testimony about his alleged sexual encounter with Christine. He maintains that the Court of Appeals's decision in *Johnson v. State*, 332 Md. 456, 632 A.2d 152 (1993), supports his argument.

In *Johnson,* the defendant's defense against a rape charge was that the victim had consented to have sex with him and two other men in exchange for crack cocaine and that she had falsely accused them of rape when, after performing her part of the bargain, they would not perform theirs. To corroborate his theory, the defendant sought to elicit, on cross-examination of the victim, that soon before the alleged rape, she had traded sex for crack cocaine with others. In an *in camera* hearing, the victim acknowledged that for a period of six months immediately preceding the alleged rape, and as recently as one week before the alleged rape, she had traded sex for crack cocaine. The trial court ruled the evidence inadmissible, however, under the Rape Shield Law.

On appeal, the Court of Appeals held that the evidence should not have been excluded under the Rape Shield Law. It

reasoned that the defendant's testimony that the victim had agreed to have sex for crack cocaine was admissible because it was probative of her having an ulterior motive (revenge) for accusing him of rape. It then explained that the evidence that the victim had in the recent past traded sex for crack cocaine with others was admissible because it was not being offered to show bad character, but to show that she had a disposition to engage in the conduct that, according to the defendant, gave rise to her motive to falsely accuse him:

When the [defendant] cross-examined the victim concerning her previously having [traded sex for crack cocaine], his purpose was not to show that she was a person of bad character—a sexually promiscuous person, *see Smallwood* [*v. State*], 320 Md. [300,] 304[, 577 A.2d 356 (1990) ] ...; rather, it was to show that she had the disposition, displayed at some earlier time, to engage in such conduct and from that conduct coupled with her not having been paid, that she falsely accused him of rape. Proof of that particular disposition is relevant and material to the threshold determination whether, on the occasion in question, the victim was, as the [defendant] alleged, [trading sex for crack cocaine.] How relevant and material depends upon the ... strength of the disposition evidence, *e.g.,* its closeness in point of time to the incident in question. Her disposition to [trade sex for crack cocaine] was established when the victim admitted having engaged in the relevant behavior over a six-month period and as recently as within a week of the alleged rape.

*Id.* at 472, 632 A.2d 152.

The appellant argues that just as the evidence of the *Johnson* victim's past sexual conduct with others was relevant to her ulterior motive to falsely accuse the defendant, and thus was admissible, the evidence of Christine's past sexual conduct with others was relevant to the origin of the semen on her nightshirt, and thus was admissible. We disagree with this analogy.

*Johnson* was concerned with subsection (a)(3) of the Rape Shield Law. That subsection permits evidence of specific

instances of the victim's prior sexual conduct that *"supports a claim* that the victim has an ulterior motive in accusing the defendant of the crime."[2] (Emphasis added.) Evidence that the victim in that case had in the recent past traded sex for drugs tended to support the defendant's claim that she had falsely accused him of rape out of revenge, when he failed to give her drugs after she performed a sex act for him. Subsection (a)(2) of the Rape Shield Law, at issue in the case *sub judice,* is more narrowly drawn than is subsection (a)(3). It permits "[e]vidence of specific instances of sexual activity showing the source or origin of semen. . . ." It does not broadly permit evidence *supporting a claim* about the source or origin of semen.

The appellant's alleged sexual encounter with Christine in her backyard was a specific instance of sexual activity that could show that even though he was the source of the semen found on Christine's nightshirt, conduct by him on the night of the attempted rape was *not* the source of that semen. Accordingly, it fell squarely within the scope of subsection (a)(2) of the Rape Shield Law, and it was relevant and material to a central fact in issue: whether the appellant's semen on Christine's nightshirt showed that he was the person who had attempted to rape her. The excluded evidence, a tacit admission (by failure to deny) that, at unspecified times and with unspecified people, Christine had offered to trade sex for cigarettes, was not evidence of a specific instance of sexual activity showing the source of the semen on her nightshirt. It was not evidence of any specific instance of sexual activity; it was not evidence that any such sex for cigarettes trade had occurred with any person other than the appellant; and, even if there had been specific instances, by definition they would have involved other men, and therefore would not have been relevant to show how the appellant's semen came to be on Christine's nightshirt.

---

**2.** To be admissible under this or any of the other subsections of the Rape Shield Law, the proffered evidence also must be relevant and material to a fact in issue and its prejudicial effect must not outweigh its probative value.

■ The proffered testimony of Ms. Preisinger was non-specific evidence of Christine's reputation for chastity that was offered to bolster the appellant's testimony about the alleged backyard incident. It was not admissible under subsection (a)(2) of the Rape Shield Law. Moreover, it was classic negative propensity evidence offered by the appellant in an effort to support his claim that an event that he contended was responsible for the damaging DNA evidence indeed had occurred. The appellant did not have a constitutional due process right to introduce propensity evidence. *Thomas v. State*, 301 Md. 294, 318–19, 483 A.2d 6 (1984) (citing *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)), *cert. denied*, 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985).

## II

■ The appellant contends that the sentencing court erred in imposing separate sentences for his first degree burglary and attempted first degree rape convictions. He argues that under the required evidence test, *see Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), his sentence for first degree burglary merged into his sentence for first degree attempted rape. The State agrees that the sentencing court erred in this regard.

■ The required evidence test " 'focuses upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter.' " *State v. Lancaster*, 332 Md. 385, 391, 631 A.2d 453 (1993)(quoting *Snowden v. State*, 321 Md. 612, 617, 583 A.2d 1056 (1991)).

First degree rape includes, *inter alia*, "vaginal intercourse with another person by force or threat of force against the will and without the consent of the other person and: ... (5)[t]he person commits the offense in connection with burglary in the first, second, or third degree." Md.Code (1957, 1996 Repl.Vol. & 2000 Supp.), art. 27, § 462(a).

The State's theory in this case was that the attempted first degree rape was committed in connection with a burglary in the first, second, or third degree. Consistent with that theory, the jury was instructed that, "to convict the defendant of attempted first degree rape, the State must prove all of the elements of the attempted second degree rape, and must also prove that the defendant committed the offense in connection with a burglary in the first, second, or third degree." Thus, in this case, an element of the crime of attempted first degree rape, for which the appellant was convicted, was the commission of the first degree burglary, for which the appellant also was convicted. Accordingly, under the required evidence test, first degree burglary merged into attempted first degree rape. While the appellant could be convicted of both crimes, his Maryland common law right against double jeopardy protected him from being punished for each crime. *Middleton v. State,* 318 Md. 749, 757, 569 A.2d 1276 (1990). Thus, the sentencing court erred in not merging the offenses for sentencing purposes.

**SENTENCE FOR FIRST DEGREE BURGLARY VACATED. JUDGMENTS OTHERWISE AFFIRMED. COSTS TO BE PAID ONE–HALF BY THE APPELLANT AND ONE HALF BY HARFORD COUNTY.**