*State of Maryland v. Nicholas Heath*, No. 36, September Term, 2018. Opinion by Greene, J.

**CRIMINAL LAW – PROCEEDINGS – OPENING STATEMENT – "OPENING THE DOOR" – APPROPRIATE REBUTTAL EVIDENCE**

Although comments made in opening statement are not evidence, pursuant to the "opening the door" doctrine, the general principles involved in allowing a party "to meet fire with fire" are applicable to an opening statement in which improper comments are made. The remedy to allow responsive evidence to be admitted is applicable provided the response is proportionate to the malady and not otherwise limited by law.

A criminal defendant's trial counsel who, during opening statement, called attention to Respondent's purpose for being at a bar the night the underlying events took place triggered an analysis of the application of the "opening the door" doctrine. The Court of Appeals held that the trial court erred in admitting into evidence a previously redacted portion of Mr. Heath's statement to the police, *i.e*., that Mr. Heath intended to sell "white" at Ottobar. The trial court first erred in admitting the statement because it was irrelevant to the issues in the case. Second, the statement was a disproportionate response to the comment made in opening. And third, even if the evidence was relevant, it should not have been admitted because its probative value was substantially outweighed by the danger of unfair prejudice.

The trial court committed an error of law and abused its discretion in allowing the unredacted statement into evidence and the error was not harmless. Therefore, the Court of Appeals affirmed the judgment of the Court of Special Appeals, which reversed the trial court's ruling and remanded the case for a new trial.

IN THE COURT OF APPEALS

OF MARYLAND

No. 36

September Term, 2018

_____

STATE OF MARYLAND

v.

NICHOLAS HEATH

_____

Barbera, C.J.
Greene
McDonald
Watts
Hotten
Getty
Cathell, Dale R. (Senior Judge, Specially
Assigned)

JJ.

_____

Opinion by Greene, J.
Barbera, C.J. and McDonald, J., dissent.

_____

Filed: June 28, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In the present case, we consider whether a comment made by defense counsel in an opening statement invited the State to present, as evidence, a statement made by Respondent Nicholas Heath ("Mr. Heath") indicating his intention to sell cocaine. The State urges us to apply the opening the door doctrine to the facts of the present case, and hold that defense counsel, through her opening statement, opened the door to admitting, as evidence, Mr. Heath's stated intention. To resolve this issue we explore whether defense counsel's remarks triggered the opening the door doctrine, and if so, whether the responsive evidence offered by the State was a proportional response. For reasons we shall explain, we hold that the trial court erred in admitting irrelevant evidence and abused its discretion in weighing the proportionality of the contested portion of Mr. Heath's statement. The error in doing so was not harmless; thus, we affirm the judgment of the Court of Special Appeals.

## FACTUAL & PROCEDURAL BACKGROUND

Mr. Heath was charged with the murder of Tom Malenski ("Mr. Malenski") and the attempted murder of Martin Clay ("Mr. Clay"). The charges stemmed from an altercation that happened on September 25, 2014 at Ottobar, where Mr. Malenski and Mr. Clay were employed, in Baltimore City. The undisputed facts are that on the evening of September 25, 2014, Dustin Cunningham ("Mr. Cunningham") directed inappropriate comments toward Erica Davis ("Ms. Davis") and Ms. Davis's unidentified friend. Mr. Heath, in an attempt to quell any hostility between Mr. Cunningham and Ms. Davis, offered an apology to Ms. Davis and her friend on Mr. Cunningham's behalf. Ms. Davis did not accept the

apology. She, instead, directed Mr. Heath to inform Mr. Cunningham that he needed to apologize himself for the comments that he had made.

Eventually, after continued antagonism between the individuals, the bouncers removed Mr. Cunningham from the bar. Both Mr. Clay and Mr. Malenski aided the bouncers in removing Mr. Cunningham. Mr. Malenski was not working at Ottobar that night and Mr. Clay had gotten off of work at 11:00 p.m., but each were "hanging out" at Ottobar at the time of the altercation. Mr. Cunningham claimed that, once outside, the bouncers attempted to beat him up, so he ran away. Mr. Clay and Mr. Malenski ran down the street after Mr. Cunningham, but he successfully escaped. Thereafter, Mr. Clay and Mr. Heath offered conflicting stories as to what happened.

According to Mr. Clay, while he and Mr. Malenski were walking back to Ottobar, Mr. Heath came towards them with a knife. At first, Mr. Clay thought that Mr. Heath had punched him in the face, but he ultimately realized that he had been cut. Mr. Clay testified that, while Mr. Malenski was trying to "get in between" Mr. Clay and Mr. Heath, Mr. Heath slashed Mr. Malenski's throat.

Offering a different version of the events, Mr. Heath, in his recorded statement to the police, indicated that upon leaving Ottobar, he headed in the direction of where Mr. Cunningham had fled. According to Mr. Heath, the men who had chased Mr. Cunningham, including Mr. Clay and Mr. Malenski, were walking back toward Ottobar. The group of men approached Mr. Heath while he was trying to pass them. Mr. Heath's path was blocked, and the men began arguing with him. Mr. Heath claimed that he saw Mr. Malenski pull out a knife. Mr. Heath, in trying to defend himself from an attack, told the

2

men to back off. He explained that Mr. Clay probably got cut in the face while Mr. Heath was defending himself against the attack. Mr. Heath said that he intended to cut Mr. Malenski's deltoid muscle and that would have prevented Mr. Malenski from raising his arms. Mr. Heath stated that he was "merely trying to 'disable'" Mr. Malenski. Unfortunately, according to Mr. Heath, Mr. Malenski lunged forward causing Mr. Heath to accidentally cut Mr. Malenski's neck instead of his shoulder.

Although Mr. Clay's and Mr. Heath's stories diverged, it is undisputed that Mr. Heath cut Mr. Clay's face and Mr. Malenski's throat. Furthermore, it is uncontested that during the confrontation, Mr. Heath cut one of Mr. Malenski's arteries, which resulted in his death. Mr. Heath was tried in the Circuit Court for Baltimore City for the first-degree murder of Mr. Malenski, the attempted first-degree murder of Mr. Clay, and other related charges. The substantive issue at trial was whether Mr. Heath acted with criminal intent or in self-defense.

Mr. Heath did not testify at trial, so his version of the events was established by way of a recorded statement that he gave to the police during an interview on September 27, 2014. Prior to trial, and without the trial court's involvement, the parties entered into a stipulation and agreed to various redactions of Mr. Heath's statement to police.[1] The

---

[1] The parties did not involve the court in their agreement, but their agreement was brought to the court's attention. The State explained to the court:

> Prior to the opening statements, Your Honor may recall that defense counsel and . . . myself, along with I believe the defendant, discussed some redactions from the defendant's statement. Much of those redactions related to the defendant's statement in which he discussed selling drugs as his primary source of income. State, again, agreed to those redactions prior to hearing [defense counsel]'s opening statement[.]

redacted portions of the statement related to Mr. Heath's selling of drugs as his primary source of income.

During her opening statement at trial, Mr. Heath's counsel made the following comment about Mr. Heath's purpose for going to Ottobar:

> Ladies and gentlemen, the young man that sits here [next to counsel] is Nicholas Heath. And just as the State described to you in regards to [Mr. Malenski and Mr. Clay], he too loved music, liked to hang out, had friends, **was busy doing tattoos, that's one of his primary sources of income** in order to pay a lawyer to get his wife from England to the United States. **That was his goal and that was his purpose to stop by the Ottobar that night.** His friend, Dustin Cunningham says lots of people there have tattoos or had tattoos, this is a good source.

(Emphasis added).

The State did not object during defense counsel's opening statement. The State waited until its case-in-chief to respond to defense counsel's remark in opening that Mr. Heath was at Ottobar to find clients for his tattoo business.[2] Citing that remark, the State moved to unredact a portion of Mr. Heath's statement to the police, in which he said that he went to Ottobar intending to sell "white."[3] Specifically, the State sought to unredact and admit into evidence the following portion of Mr. Heath's statement:

---

[2] The State did not promptly raise an objection to defense counsel's opening remark. After two of the State's witnesses had testified, the State approached the bench and objected to defense counsel's opening remark. The trial judge did not immediately rule on the State's motion. At the end of the first day of trial, outside the presence of the jury, the judge heard arguments and ruled on the State's motion.

[3] "White" is a street name for cocaine. STREET NAMES AND NICKNAMES FOR COCAINE, https://luxury.rehabs.com/cocaine-addiction/street-names-and-nicknames/ [https://perma.cc/HM73-X6GW]. Cocaine has (continued . . .)

I mean look at nobody's being violent man. Nobody's went in there starting trouble. **I went in there to sit down to sell a got damn bit of white** that they, I'm just trying to make a fucking living. And everybody around me is gotta act like an asshole. **That's all I wanted to do.** You know am I wrong? Yeah.

(Emphasis added). The State argued that defense counsel's remark, that Mr. Heath went to Ottobar for purposes related to his tattoo business, contradicted Mr. Heath's statement to the police and opened the door to Mr. Heath's "true" purpose for being at Ottobar, his intent to sell "white."[4] Defense counsel argued that opening statements are not evidence. Furthermore, according to defense counsel, regardless of the opening the door doctrine, the portion of the statement offered by the State was inadmissible bad acts evidence. Defense counsel asserted that Mr. Heath's statement was "highly prejudicial [with] no probative [value]" and therefore should not be admitted.

The trial court weighed the probative value and prejudicial effect of the contested portion of Mr. Heath's statement and reasoned that Mr. Heath's explanation for "being present [at Ottobar] . . ." was probative of "the manner in which he is alleged to have conducted himself that evening." The trial judge expressed that he "would not have

---

(. . . continued)

many nicknames, but "white" is one "of the more popular and enduring names used in the United States[.]" *Id.* The term "white" is derived from the drug's appearance, as it is typically a fine, white, crystalline powder. *Id.*

[4] Notably, Mr. Heath's statement to the police does not indicate that he went to Ottobar for tattoo-related purposes. Apparently, defense counsel obtained that information from Mr. Cunningham. Defense counsel stated that she had "in [her] case notes that [Mr. Cunningham] had talked to [Mr. Heath] about people [at Ottobar] that may want tattoos." She was "sp[eaking] out [sic] of information that [she] had received and honestly . . . didn't even think about the drug-dealing part . . . because [Mr. Heath's] profession . . . is tattooing."

stricken that testimony, although some of the things which have been read, not everything would appear to be fully admissible even under the probative greater than prejudicial [sic] value of standard." Ultimately, the trial court "permit[ted] the State to unredact the testimony with regard to [Mr. Heath's] statement as to why he was there that night with regard to certain business operations."

After the trial court's ruling, defense counsel requested, and was granted, a continuing objection to references to Mr. Heath's involvement in the "possession and distribution of controlled dangerous substances[.]" Additionally, the prosecutor clarified that the trial judge's ruling was limited to the portion of Mr. Heath's statement in which he says that he went to Ottobar intending to sell "white," and "that the rest of the references to [Mr. Heath] selling drugs is not probative[.]" The trial judge said, "Right." He explained that other references to selling drugs in Mr. Heath's statement to the police are "beyond the pale . . . it's relevant only to that night and [Mr. Heath's] presence at Ottobar."

Later in the trial, Mr. Heath's statement to the police, including the portion in which he said that he went to Ottobar intending to sell "white," was admitted into evidence over defense counsel's objection. A recording of Mr. Heath's statement was played in open court for the jury. Mr. Heath did not offer any evidence tending to establish that he visited Ottobar for reasons related to his tattoo business, or for any other reason. Ultimately, the jury returned a verdict against Mr. Heath of guilty to involuntary manslaughter and second-degree assault.

Mr. Heath appealed his convictions to the Court of Special Appeals. In an unreported opinion, our intermediate appellate court reversed the trial court's ruling that

6

the door had been opened. *Heath v. State*, No. 2736, Sept. Term 2015, 2018 WL 3085156, at \*6 (Md. Ct. Spec. App. June 21, 2018). First, the intermediate appellate court held that Mr. Heath's statement that he went to Ottobar to sell "white" constituted inadmissible bad acts evidence pursuant to Md. Rule 5-404. *Id*. at \*8-11. Additionally, the court determined that Mr. Heath's counsel did not open the door during her opening statement. *Id*. at \*13. Alternatively, the court reasoned that, "[a]ssuming *arguendo* that [Mr. Heath's] counsel had 'opened the door,' the remedy – permitting the prior acts statement to come in – was not proportionate to the malady – impugning [Mr. Heath's] character in the eyes of the jury." *Id*. Ultimately, the Court of Special Appeals held that the trial court's error in allowing the statement into evidence was not harmless and therefore reversed and remanded the case for a new trial. *Id*. at \*7.

The State petitioned this Court for a writ of *certiorari* and we granted the petition. *State v. Heath*, 461 Md. 458, 193 A.3d 208 (2018). We now review whether the trial court erred when it determined that defense counsel opened the door to admitting the defendant's previously redacted statement based upon a comment made in her opening statement and, if so, whether admitting the defendant's statement in response was legal error and an abuse of discretion.[5]

---

[5] The questions posed in the State's petition for writ of certiorari included:

1. Does [the] introduction of evidence that opens the door to the admission of "other act" evidence operate to give the other act evidence "special relevance," thereby relieving a party seeking to introduce other act evidence (in response to the door being opened) of the burden to establish "special relevance" under Maryland Rule 5-404 and *State v. Faulkner*, 314 Md. 630 (1989)?

(continued . . .)

As a preliminary matter, the parties ask us to define the standard for reviewing whether a party has opened the door to the admissibility of responsive evidence. The State requests that we review this case as an application of the opening the door doctrine. Mr. Heath, on the other hand, argues that the opening the door doctrine is not applicable here. In addition, the State asserts that we should reverse the Court of Special Appeals on the basis that the trial court did not abuse its discretion when it admitted into evidence Mr. Heath's statement regarding his intent to sell "white" at Ottobar. The State contends that the admission of Mr. Heath's statement was a proportional response to defense counsel's opening statement regarding Mr. Heath's intent to find tattoo clients at Ottobar. Mr. Heath

---

(. . . continued)

2. Should an appellate court reviewing a trial court's ruling that a party has "opened the door" to otherwise inadmissible evidence apply an abuse of discretion standard, and does that standard include a first-level fact-finding by the trial court that is subject only to review for clear error?

3. Applying the appropriate standard of review, did the Court of Special Appeals err first, by holding that counsel cannot open the door based upon comments made in an opening statement and second, by substituting its judgment for the trial court's determination and making a factual finding about the intent and effect of Heath's counsel's comment in opening statement, and whether it opened the door to admission of Heath's statement to police that he went to the bar where Malenski was murdered for the purpose of selling cocaine?

4. Did the Court of Special Appeals err in concluding that admission of a lone comment in the defendant's recorded statement that he planned to sell drugs was not harmless, where the State made no further mention of the statement at trial?

argues, however, that even if the door was opened, Md. Rule 5-404 prohibits the admission of the rebuttal evidence that the State offered.[6]

We hold that the general principles of the opening the door doctrine that allow a party "to meet fire with fire" permitted the trial judge to consider whether to admit into evidence Mr. Heath's statement that he intended to sell "white" at Ottobar. The trial judge, however, failed to recognize that Mr. Heath's intention to sell drugs at Ottobar injected into the case evidence on a collateral issue. The introduction of a collateral issue and the evidence offered on that issue had nothing to do with the underlying criminal charges and exceeded one of the limitations to the introduction of responsive evidence under the "opening the door" doctrine.

Another limitation under the "opening the door" doctrine is proportionality. *Terry v. State*, 332 Md. 329, 338, 631 A.2d 424, 428 (1993) (."[T]he remedy must be proportionate to the malady."). The responsive evidence permitted by the trial judge was disproportionate because the jury would likely give more weight to a statement admitted into evidence than to a comment made in opening. This disproportionality stems from the instructions given to the jury. Specifically, the trial judge instructed the jury to make its decision based solely on the evidence admitted and not on what was said in opening statements.

---

[6] This Court does not reach the issue of character evidence and whether the statement was inadmissible under Md. Rule 5-404. The evidence was inadmissible on various other grounds, so we need not determine in this case whether a criminal defendant's bad thoughts constitute a bad act, wrong or other crime under Md. Rule 5-404(b).

Regardless of whether the statement was a proportionate response, allowing the State to admit Mr. Heath's statement into evidence was substantially more prejudicial than probative under Md. Rule 5-403 and should not have been received. Clearly, the statement was unfairly prejudicial in that it associated Mr. Heath with drugs and likely undermined his credibility with the jury. The jury had to evaluate Mr. Heath's version of what occurred at Ottobar on the evening of September 25, 2014, and his theory of self-defense.

Given the unfair prejudicial impact that Mr. Heath's statement had on his credibility, and how that likely affected the jury's perception of him, we cannot say beyond a reasonable doubt that the jury's verdict was in no way influenced by the responsive evidence. In admitting the evidence, the trial judge risked the jury finding Mr. Heath guilty based on the inference that Mr. Heath was "up to no good." Therefore, the statement's admission at trial was not harmless error and Mr. Heath is entitled to a new trial.

## STANDARD OF REVIEW

The standard for reviewing whether the opening the door doctrine yields to the admissibility of evidence offered at trial was thoroughly reviewed in this Court's recent decision, *State v. Robertson*, 463 Md. 342, 352-58, 205 A.3d 995, 1000-1004 (2019). The framework for review is a familiar one. *See id.* Whether an opening the door doctrine analysis has been triggered is a matter of relevancy, which this Court reviews *de novo*. *Id.* at 353, 205 A.3d at 1001. A trial court does not have discretion to admit irrelevant evidence. *State v. Simms*, 420 Md. 705, 724-25, 25 A.3d 144, 155 (2011) ("The *de novo* standard of review is applicable to the trial judge's conclusion of law that the evidence at

issue is or is not of consequence to the determination of the action.") (quoting *Parker v. State*, 408 Md. 428, 437, 970 A.2d 320, 325 (2009) (cleaned up).

Whether responsive evidence was properly admitted into evidence is reviewed for an abuse of discretion. *Robertson*, 463 Md. at 358; 205 A.3d at 1004; *Simms*, 420 Md. at 725, 25 A.3d at 156 ("whether the evidence is inadmissible because its probative value is outweighed by the danger of unfair prejudice . . . is [] tested for abuse of [] discretion."). Additionally, an error is harmless if a reviewing court can say, after an independent review of the record, that beyond a reasonable doubt, the error in no way influenced the verdict. *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976). This Court has held that an "[a]buse of discretion exists where no reasonable person would take the view adopted by the trial court, or when the court acts without reference to guiding rules or principles." *Robertson*, 463 Md. at 364, 205 A.3d at 1007 (quoting *Alexis v. State*, 437 Md. 457, 478, 87 A.3d 1243, 1254 (2014)) (cleaned up).

*Relevance and the "Opening the Door" Doctrine*

Maryland Rule 5-401 provides the scope for the admission of evidence. The starting point for determining the admissibility of evidence is whether it is relevant. Relevant evidence is evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401 (2018). The inverse of that rule, of course, is that "[i]rrelevant evidence is inadmissible." *Simms*, 420 Md. at 725, 25 A.3d at 156 (citations omitted). Maryland Rule 5-402 "makes it clear that the trial court does not have discretion to admit irrelevant evidence[.]" *Id*. at 724-25, 25 A.3d at 155 (citation omitted).

11

Once the first hurdle of legal relevancy is satisfied, the next consideration is "whether the evidence is inadmissible because its probative value is outweighed by the danger of unfair prejudice, or other countervailing concerns as outlined in Maryland Rule 5-403." *Id*. at 725, 25 A.3d at 156 (citation omitted). Some evidence may be relevant but far too prejudicial to be admissible. *See* Md. Rule 5-403 (requiring a weighing of unfair prejudicial danger versus the probative value).

*"Opening the Door" and Opening Statements*

An added layer to Maryland Rules 5-401 and 5-403 is the legal doctrine of "opening the door," which expands the rule of relevancy. The opening the door doctrine "authorizes admitting evidence which otherwise would have been irrelevant in order to respond to (1) admissible evidence which generates an issue, or (2) inadmissible evidence admitted by the court over objection." *Clark v. State*, 332 Md. 77, 84-85, 629 A.2d 1239, 1243 (1993). For example, the doctrine provides a remedy where one party introduces evidence that was previously irrelevant, over objection, and in doing so, makes relevant an issue in the case. As a remedial tactic, "the trial court may rule that the first party has 'opened the door' to evidence offered as a fair response by the opposing party that previously would have been inadmissible because irrelevant, but has now become relevant." 5 Lynn McLain, *Maryland Evidence State and Federal*, § 103:13(c)(i) at 82 (3rd ed. 2013). Put another way, "'opening the door' is simply a way of saying: 'My opponent has injected an issue into the case, and I ought to be able to introduce evidence on that issue.'" *Clark*, 332 Md. at 85, 629 A.2d at 1243.

Although the "opening the door" doctrine expands the rule of relevancy, the doctrine has its limitations. The doctrine does not allow, for example, "injecting collateral issues into a case or introducing extrinsic evidence on collateral issues." *Id*. at 87, 629 A.2d at 1244. A collateral issue is one that is immaterial to the issues in the case. *See Hardison v. State*, 118 Md. App. 225, 239, 702 A.2d 444, 451 (1997) (defining a "non-collateral fact" as one that is material to the issues in the case); *see also Gray v. State*, 137 Md. App. 460, 481-85, 769 A.2d 192, 204-06 (2001) (holding that testimony from a witness concerning her being raped was a collateral issue because the alleged rape existed only as an unproven allegation, testimony of the allegation was highly likely to lead the jury on a detour as to whether the rape had actually happened and would distract the jury).

An additional limitation of the doctrine is consistent with Maryland Rule 5-403. That limitation excludes evidence if its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5-403; *see also Clark*, 332 Md. at 87, 629 A.2d 1244.[7]

We echo an oft-repeated and well-established principle: opening statements are not evidence. *See Ford v. State*, 462 Md. 3, 33, 197 A.3d 1090, 1107 (2018) (citing *Keller v. Serio*, 437 Md. 277, 288, 85 A.3d 283, 289 (2014)). In *Ford*, we highlighted several

---

[7] Maryland Rule 5-403 was not codified at the time this Court decided *Clark*. In *Clark*, this Court adopted the language of Federal Rule of Evidence 403 as a limitation to the "opening the door" doctrine. *Clark v. State*, 332 Md. 77, 87, 629 A.2d 1239, 1244 (1993). Several months after the filing of *Clark*, on December 15, 1993, this Court adopted Rule 5-403, which is derived from Federal Rule of Evidence 403.

13

definitions of an "opening statement." *Id.* at 32, 197 A.3d at 1106-07. In summary, we explained the term as "a statement by counsel made at the beginning of a trial, before the presentation of evidence, in which counsel usually provides the fact-finder with an outline of the case, the evidence that is to be presented, and the arguments that are to be made." *Id.* at 32-33, 197 A.3d at 1107. We emphasized there that "an opening statement is not itself evidence, as it is given prior to the presentation of evidence, and often includes a preview of the evidence that counsel expects to present during trial." *Id.* at 33, 197 A.3d at 1107. Previously, we have counseled that "[a]n opening statement should refer to facts that will be admissible in evidence." *Terry v. State*, 332 Md. 329, 337, 631 A.2d 424, 428 (1993).

Nonetheless, pursuant to our case law, a comment in opening may "open the door" to evidence offered by the opposing party that previously would have been irrelevant, but has become relevant. *Id.*; *see also Little v. Schneider*, 434 Md. 150, 161, 73 A.3d 1074, 1080 (2013) ("the doctrine of 'opening the door' applies equally in opening statements, witness examination, and closing arguments."); *Johnson v. State*, 408 Md. 204, 226, 969 A.2d 262, 275 (2009) ("It is equally well settled that the State's case-in-chief may include 'rebuttal' evidence to which the defense has 'opened the door,' . . . during opening statement[.]").

In *Martin*, *v. State*, we held that a statement made in opening can trigger the "opening the door" doctrine. 364 Md. 692, 708, 775 A.2d 385, 394 (2001). However, we limited our examination to whether the responsive evidence was proportionate to defense counsel's opening remark. *Id.* In that case, Dorian Martin ("Mr. Martin"), a former

14

Baltimore City police officer, was charged with theft and misconduct in office. *Id.* at 695, 775 A.2d at 386. In opening statement, defense counsel told the jury that it was Mr. Martin's "life-long desire to become a police officer," that the police department was using Mr. Martin as a "'sacrificial lamb' for the Hispanic community" and that the department "'abandoned' him." *Id.* at 705, 775 A.2d at 392. The trial judge allowed the State to introduce evidence that Mr. Martin consulted with an attorney after he was accused of robbery and that, immediately after the consultation, he resigned from the police force. *Id.* at 703, 775 A.2d at 391. According to the trial judge, that evidence was relevant for purposes of rebutting defense counsel's opening remarks. *Id.* at 705, 775 A.2d at 392.

On appeal from that ruling, we held that "[t]he State's use of [Mr. Martin's] consultation with an attorney to rebut defense counsel's 'abandonment' assertion was not a proportionate response." *Id.* at 708, 775 A.2d at 394. We noted that "[e]vidence of a criminal defendant's consultation with an attorney is highly prejudicial, as it is likely to give rise to the improper inference that a defendant in a criminal case is, or at least believes himself to be guilty[,]" and concluded that "[t]he danger of unfair prejudice presented by the introduction of this evidence substantially outweighed any probative value, and it should not have been admitted." *Id.* at 708-09, 775 A.2d at 394-95.

## DISCUSSION

In the present case, defense counsel, during her opening statement, presented a fact that triggered the opening the door analysis. Defense counsel asserted that Mr. Heath sought to be reunited with his wife and that he was at Ottobar to find clients for his tattoo business to make money to pay for her transportation to the United States. As such, the

15

trial court needed to decide whether the State could admit, as responsive evidence, a previously redacted portion of Mr. Heath's statement to the police. The State contended that Mr. Heath's "true" reason for going to Ottobar was reflected in his statement to the police, which was to sell drugs.

We conclude that the trial court committed a legal error when it admitted the prosecutor's responsive, but legally irrelevant, evidence on a collateral issue. In addition, the trial court abused its discretion when it allowed the prosecutor to present evidence that was not a proportionate response to remarks made in defense counsel's opening statement. Lastly, the trial court abused its discretion when it concluded that the probative value of the prosecutor's responsive evidence was not substantially outweighed by the danger of any unfair prejudice.

First, Mr. Heath's intent to sell "white" at Ottobar was a collateral issue that should not have been injected into the case. It was immaterial to the issues in the case, namely Mr. Heath's culpability in the death of Mr. Malenski and the assault on Mr. Clay. The dispositive question is whether the evidence used by the State was relevant to a fact or matter that is material to the issue in the case. *See Pearson v. State*, 182 Md. 1, 14, 31 A.2d 624, 629 (1943) ("Evidence of collateral facts . . . should be excluded, for the reason that such evidence tends to divert the minds of the jury from the real point in issue, and may arouse their prejudices."). Here, Mr. Heath's intent to sell cocaine at Ottobar had nothing to do with the underlying criminal charges, and thus exceeded the limitations of the opening the door doctrine.

16

Secondly, in permitting the State to respond to defense counsel's opening remark, the trial judge was limited to providing a "remedy [that was] proportionate to the malady." *Terry*, 332 Md. at 338, 631 A.2d at 428. In *Terry*, defense counsel told the jury in opening statement that the defendant entered a plea of not guilty to the charge of conspiracy to distribute cocaine and related charges because he was innocent. *Id.* at 332, 631 A.2d at 425. The trial court permitted the State to respond to that statement by introducing evidence that the defendant had a previous conviction of possession of cocaine with intent to distribute, on the theory that the defendant may not have wanted to plead guilty because he faced "back up time" for violating his probation, and mandatory sentencing as a subsequent offender. *Id.* at 332-33, 631 A.2d at 425-26. We explained that, in admitting evidence under the "open door" doctrine, "the remedy must be proportionate to the malady[,]" and held that evidence of the previous conviction should not have been admitted because the impact of that evidence was "fraught with [the] danger of improper prejudicial use by the jury." *Id.* at 338, 631 A.2d at 428.

The responsive evidence admitted by the trial judge in the present case was a disproportionate response to the comment made in defense counsel's opening statement because it did not properly counterbalance defense counsel's inappropriate comment. Similar to *Terry*, in the present case, a comment made in opening was determined to be inappropriate because "[a]n opening statement should refer to facts that will be admissible in evidence." *Id.* at 337, 631 A.2d at 428. Even if defense counsel's comments were designed to gain the jury's sympathy, the State's responsive evidence failed to rebut that suggestion in a proportionate way. Combating defense counsel's remark with Mr. Heath's

17

admission regarding his intention to sell drugs was "tantamount to killing an ant with a pile driver." *See id.* at 339, 631 A.2d at 429.

There is an inherent difference between the weight that a jury is instructed to give evidence and the weight that a jury is instructed to give a comment made in opening. Here, the jurors were instructed to decide Mr. Heath's guilt or innocence based on the evidence presented to them, and that opening statements were not evidence.[8] Given the trial judge's instructions, it is not unlikely that the jury gave greater weight to the responsive evidence offered by the State, which was disproportionate to the attempt by defense counsel to bolster her client's reputation in her opening statement.

Third, even if the responsive evidence were relevant, it was highly prejudicial when compared to the probative value that it offered. The State conceivably offered evidence of Mr. Heath's intent to sell drugs because an issue arose, due to defense counsel's opening statement, as to Mr. Heath's true purpose for going to Ottobar. In response to a slight bolstering by defense counsel, the trial court permitted the State to attack the credibility of Mr. Heath by associating him with drugs. An association with drugs is extremely prejudicial given the fact that Mr. Heath was not charged with a drug related offense. *See Hannah v. State*, 420 Md. 339, 347, 23 A.3d 192, 196 (2011) ("Evidence is prejudicial

---

[8] During the jury instructions, the trial judge gave the following instructions on evidence and opening statements:

> During your deliberations, you must decide this case based only on the evidence that you and your fellow jurors heard together in the courtroom. . . . Opening statements and closing arguments of lawyers are not evidence. They are intended only to help you to understand the evidence and to apply the law. Therefore, if your memory of the evidence differs from anything the lawyers or I may say, you must rely on your own memory of the evidence.

18

when it tends to have some adverse effect . . . beyond tending to prove the fact or issue that justified its admission.") (citation omitted). The evidence offered by the State had the "adverse effect" of attacking Mr. Heath's credibility and likely misled the jury to believe that Mr. Heath's intent to engage in drug dealing played a role in the altercation. As such, the probative value of Mr. Heath's statement to the police was substantially outweighed by the danger of unfair prejudice and should not have been admitted. Md. Rule 5-403.

Moreover, Mr. Heath's credibility was at issue because of his claim of self-defense. The success of that claim depended upon the jury's willingness to believe Mr. Heath's version of the events. Evidence that Mr. Heath went to Ottobar to sell drugs undermined not only his character but also his credibility. *See State v. Giddens*, 335 Md. 205, 217, 642 A.2d 870, 875-876 (1994) (noting that involvement in the manufacture or distribution of drugs is relevant to a person's credibility and affects it in a negative way).

*Whether a Remedy is Proportionate*

We now examine what would have been a proportionate response to defense counsel's remarks in opening statement. The State did not object to defense counsel's opening remarks when they were made and, instead, waited until its case-in-chief was well underway to seek recourse. The State's decision to forego a timely remedy – while, perhaps, a strategic decision – was not the proper way to remedy defense counsel's malady. A proper response by the State in reaction to defense counsel's opening remarks would have been to object and request that the trial judge strike the comments relating to Mr. Heath's purpose for being at Ottobar and to admonish the jury to disregard the inappropriate portion of defense counsel's opening remarks. To strike the objectionable

19

portions of the opening statement would, indeed, have been a proportional response since counsel had a stipulation about facts that would be redacted from Mr. Heath's pretrial statement to the police.

*Harmless Error*

In the present case, the court erred when it allowed the unredacted statement into *evidence* to combat an inappropriate comment made in *opening*. Accordingly, reversal is required "unless the error did not influence the verdict." *Porter v. State*, 455 Md. 220, 234, 166 A.3d 1044, 1052 (2017) (citation omitted). Conversely, if there is a possibility that the error played a role in the jury's verdict, the error is prejudicial and a reversal is mandated. *Id.* An error cannot be deemed harmless "unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict[.]" *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976). We must "be satisfied that there is no reasonable possibility that the evidence complained of – whether erroneously admitted or excluded – may have contributed to the rendition of the guilty verdict." *Id.*

The State argues that because Mr. Heath admitted to engaging in a fight with Mr. Malenski and Mr. Clay, the second-degree assault conviction was likely inevitable. Therefore, according to the State, the comment that was admitted into evidence was harmless because Mr. Heath would have been convicted whether or not the statement was admitted into evidence. Next, the State contends that the statement about planning to sell cocaine in Ottobar was harmless. This is so, according to the State, because the prosecutor did not mention or refer to Mr. Heath's selling of cocaine for the rest of the trial and did

20

not use the statement to characterize Mr. Heath as a drug dealer. Finally, the State asserts that the jury *may not* have understood what "white" meant and, therefore, did not associate Mr. Heath with drugs in any way.

The State's contentions regarding harmless error fail on several accounts. In our view, the association with the distribution of illicit drugs unfairly impeded Mr. Heath's credibility with the jury. Evidence that Mr. Heath intended to sell drugs unfairly gave the jury reason to disbelieve Mr. Heath's claim of self-defense. As a result, the jury may have convicted Mr. Heath solely because of his association with drugs and illicit activity.

Next, to influence the verdict, only *one* juror would have needed to understand what the term "white" meant. Given the context in which Mr. Heath used the word, we are not persuaded that no one on the jury understood that the term, as used here, referred to cocaine. Pursuant to our holding in *Dorsey,* we cannot say beyond a reasonable doubt that the jury was not influenced by the inflammatory evidence of Mr. Heath's stated intention to sell "white" at Ottobar. The error is therefore not harmless and a new trial for Mr. Heath is warranted.

## CONCLUSION

Defense counsel's comment in her opening statement about what Mr. Heath intended to do at Ottobar was not evidence, but the comment triggered an analysis under the opening the door doctrine. In applying the principles of the opening the door doctrine, the State's responsive evidence was inadmissible because it injected into the case evidence on a collateral issue and was a disproportionate response to defense counsel's opening remark. Furthermore, even if the State's responsive evidence was determined to be non-

21

collateral/relevant, the probative value of Mr. Heath's statement was substantially outweighed by the danger of unfair prejudice. *See* Md. Rule 5-403. The trial judge's errors were not harmless, given the unduly prejudicial impact on Mr. Heath's credibility. Therefore, Mr. Heath is entitled to a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

Circuit Court for Baltimore City
Case Nos. 114296017
        114296018
Argued: January 3, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 36

September Term, 2018

_____

STATE OF MARYLAND

v.

NICHOLAS HEATH

_____

Barbera, C.J.
Greene
McDonald
Watts
Hotten
Getty
Cathell, Dale R. (Senior Judge,
Specially Assigned),
        JJ.

_____

Dissenting Opinion by McDonald, J.
which Barbera, C.J., joins.

_____

Filed: June 28, 2019

As the Majority Opinion recounts, there was no dispute at trial that Nicholas Heath wielded the knife that fatally slashed Tom Malenski's neck and that severely wounded Martin Clay outside Ottobar on the evening of September 25, 2014. Rather, the issue at trial was how he had come to do so and with what intent.

Mr. Heath elected not to testify at the trial. His version of the incident was presented through a recording of his interview with police detectives that was introduced into evidence by the State. One problem with that recorded interview, from Mr. Heath's perspective, was that he had also made extensive admissions to the detectives that he was involved in selling illegal drugs. With reference to the evening in question, Mr. Heath told the detectives that he had gone to Ottobar not to "start trouble" but rather to sell "a bit of white … to make a … living." Prior to the trial, the prosecution and the defense agreed that Mr. Heath's admissions of drug dealing, including his purpose in being at Ottobar on the night of the incident, would be redacted from the recording that was to be played for the jury, as well as from the transcript of that recording.[1]

In opening statement, however, defense counsel chose to take the whitewash of the recorded interview a bit further. She told the jury that Mr. Heath had gone to Ottobar that

---

[1] The unredacted version of the recorded interview does not appear in the record. However, when the trial court and counsel discussed the redaction of that recording, the prosecutor noted that the transcript of the unredacted recording contained "page after page after page" of Mr. Heath discussing his drug dealing activities and that the redactions eliminated Mr. Heath's statements about drug dealing as "his primary source of income." Neither defense counsel nor the court disputed those descriptions of the complete recording and the redactions.

night for the relatively benign purpose of promoting his tattoo business in order to raise money to bring his wife to the United States from Great Britain.[2] The State argued that the defense had thereby opened the door to restoring Mr. Heath's references to his drug dealing in the recorded statement that was to be played for the jury. In response, the trial court adopted a measured approach. The State was not permitted to restore all of Mr. Heath's admissions of drug dealing to the recording and transcript, but only his statement as to why he had gone to Ottobar. That statement comprises approximately nine seconds of an interview that lasted well over an hour and occupies less than two lines of the 39-page single-spaced transcript of the otherwise redacted recording.

Having obtained that relief, the State did not exploit it. The prosecutor did not direct the jury's attention to Mr. Heath's statement about selling a "bit of white" – or even present any evidence explaining that "white" was a reference to cocaine. Nor did she mention the statement in closing argument. The defense similarly made no mention of it during the remainder of the trial, although the defense dropped the pretense that Mr. Heath was present simply to promote his tattoo business in order to reunite with his wife. No one explained to the jury what "white" meant.

---

[2] Mr. Heath had indeed mentioned a tattoo business, as well as his wife, during the recorded interview, but that characterization of why he was at Ottobar that evening was misleading, as would be evident to anyone familiar with the unredacted recording.

When the prosecutor pointed out that the defense opening statement had deviated in this regard from Mr. Heath's recorded statement, defense counsel told the trial court that she expected Mr. Cunningham to testify that Mr. Heath was at Ottobar to solicit tattoo customers. However, she did not attempt to elicit such testimony when Mr. Cunningham was on the stand.

2

The jury ultimately convicted Mr. Heath of involuntary manslaughter of Mr. Malenski and second-degree assault of Mr. Clay. It acquitted Mr. Heath of the more serious charges, including first-degree murder and first-degree attempted murder.[3]

The Majority Opinion holds that the manslaughter and assault convictions must be reversed on the ground that the trial court abused its discretion when it restored Mr. Heath's brief statement about why he was at Ottobar that night under the "open door" doctrine.

I disagree with that conclusion for two reasons. First, the trial court appropriately exercised its discretion when it allowed a targeted response after defense counsel "opened the door" as to Mr. Heath's purpose in going to Ottobar. Second, even if that lone and ambiguous reference to his drug dealing activity should also have been excised from the redacted recording, the error was harmless beyond a reasonable doubt.

*The "Open Door" Doctrine*

Under the "open door" doctrine, once a party has opened the door, the opposing party is allowed, as a matter of fairness, to make a tailored response with evidence that, although otherwise inadmissible, has thereby become relevant. *See Little v. Schneider*, 434 Md. 150, 157 (2013); *Mitchell v. State*, 408 Md. 368, 388-89 (2009). As the Majority Opinion states, a trial court's decision as to the extent of that response is assessed by an appellate court under an abuse-of-discretion standard. Majority slip op. at 11.

---

[3] Mr. Heath was also acquitted of second-degree murder, second-degree attempted murder, first-degree manslaughter, first-degree assault, and carrying a dangerous weapon with intent to injure.

This Court has long held that the "open door" doctrine may be triggered by assertions made in an opening statement. *E.g.*, *Little*, 434 Md. at 161 ("the doctrine of 'opening the door' applies equally in opening statements, witness examination, and closing arguments"); *Mitchell*, 408 Md. at 388 (same); *Johnson v. State*, 408 Md. 204, 226 (2009) ("It is equally well settled that the State's case-in-chief may include 'rebuttal' evidence to which the defense has 'opened the door' … during opening statement …"); *Martin v. State*, 364 Md. 692, 708 (2001) ("[w]hile comments made in opening statements are not evidence …, the general principles [of the open door doctrine] are applicable") (citations and internal quotation marks omitted).

As the Majority Opinion apparently concedes, when defense counsel suggested that Mr. Heath was at Ottobar that night solely to advance his tattoo business to reunite with his wife, the defense triggered the "open door" doctrine.[4] I agree. However, the Majority Opinion further holds that the targeted response to that statement permitted by the trial court requires reversal of Mr. Heath's convictions. I disagree.

*Whether the Trial Court Abused its Discretion*

The abuse-of-discretion standard is extremely deferential to the trial court. This Court recently reiterated that "abuse of discretion exists where no reasonable person would take the view adopted by the trial court, or when the court acts without reference to guiding rules or principles." *State v. Robertson*, 463 Md. 342, 364 (2019) (quotation marks,

---

[4] *See* Majority slip op. at 15-16, 21. The Majority Opinion thus disagrees with the Court of Special Appeals, which held that the open door doctrine was not triggered on the ground that opening statements are not evidence. *See Heath v. State*, 2018 WL 3085156 at *6.

4

brackets, and citation omitted); *see also North v. North*, 102 Md. App. 1, 14 (1994) (to be an abuse of discretion, a ruling must be "well removed from any center mark … and beyond the fringe of what [is] minimally acceptable"). Thus, a ruling reviewed under that standard "will not be reversed simply because the appellate court would not have made the same ruling." *Nash v. State*, 439 Md. 53, 67 (2014).

Here, other than a conclusory statement at the outset of its analysis, the Majority Opinion does not apply the abuse-of-discretion standard. *See* Majority slip op. at 15-20. Rather, the Majority Opinion makes its own *de novo* assessment that the evidence should have been excluded on the ground that it was "highly prejudicial." Majority slip op. at 18. In other words, the Majority Opinion simply would have reached a different conclusion than the trial court.

In my view, the trial court acted within its discretion when the defense raised the question as to why Mr. Heath went to Ottobar that evening. The trial court allowed the State to un-redact two lines in a lengthy recorded statement in which Mr. Heath specifically spoke about why he was present at Ottobar. The jury was not permitted to hear his many other statements to the detectives about his drug dealing activity. Nor was any independent evidence of his drug dealing placed before the jury.[5] In my view, it cannot be said that "no reasonable person would take the view adopted by the trial court."

_____

[5] This is in contrast to *Terry v. State*, 332 Md. 329 (1993), where the prosecution countered an "innocuous," though improper, statement by defense counsel comparing the defendant to his former co-defendants by introducing independent evidence of the defendant's prior drug conviction. This Court held that the disproportionate response had "kill[ed] an ant with a pile driver." 332 Md. at 339. By contrast, in this case, the State did not respond with extraneous evidence of past drug dealing. Rather, the responsive evidence

*Whether Any Error was Harmless*

Even if the trial court ruling could be deemed an abuse of discretion, the error was harmless.  Under the doctrine of harmless error, an appellate court will not reverse a conviction if satisfied beyond a reasonable doubt that the error did not affect the verdict. *Ford v. State*, 462 Md. 3, 43-44 (2018).

There is no likelihood of such an effect in this case.  First, the two lines of the recorded statement admitted under the "open door" doctrine comprised approximately nine seconds of a recorded interview played for the jury that lasted well over an hour.  Neither party directed the jury's attention to that brief moment, nor did either party elaborate on the meaning of "white" in that statement.  Given that expert testimony is generally required to explain the significance of such a term in a drug prosecution,[6] it is quite likely that the term had no impact at all on the jury.  Nor were any witnesses called to testify about Mr.

---

consisted of Mr. Heath's own statement as to why he was present at Ottobar on the night of the incident – a statement that contrasted with the picture that defense counsel was attempting to paint.

[6] *See, e.g.*, Joelle A. Moreno, *Strategies for Challenging Police Drug Jargon Testimony*, 20 Crim. Just. 28-29 (2006) (noting that "federal courts unanimously agree that the jargon of the narcotics trade and the code that drug dealers often use are certainly beyond the ken of the average juror"); *United States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996) ("There is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis"); Annotation, *Admissibility of expert evidence concerning meaning of narcotics code language in federal prosecution for narcotics dealing – modern cases*, 104 ALR Fed 230; Annotation, *Necessity and Admissibility of Slang, Lingo, Jargon or Code Expert Testimony in State Cases*, 35 ALR 7th 6.

Heath's drug dealing on that night or any other.[7]  An instructive comparison is *Robertson*, 342 Md. at 363-64, where the Court held that the State's response to defense testimony that opened the door was disproportionate because the State elicited evidence of the details of a prior incident unrelated to the crime charged.  Here, the prosecutor never once mentioned that Mr. Heath was a drug dealer when questioning witnesses or making her closing argument.  A stray mention by the defendant himself in an hour-plus recording was the only time "white" was ever mentioned before the jury.

Second, as noted above, Mr. Heath was convicted of involuntary manslaughter and second-degree assault.  Involuntary manslaughter has no intent element, and second-degree assault requires only an intent to injure.  He was acquitted of other charges with stronger intent elements.  In his recorded interview with the detectives, Mr. Heath admitted to participating in the altercation (while admittedly being intoxicated), said that he had attempted to stab someone in the deltoid with a knife, and contended that he had accidentally slashed his victim in the throat.

Mr. Heath's only defense to the two charges of which he was convicted was that he had acted in self-defense.  Far from undermining that defense, his own statement that he had gone to Ottobar *not* to "start trouble," but just to sell "white" in order "to make a … living" was perfectly consistent with that defense.  If it was error to admit the statement, it was harmless.

---

[7] By contrast, Mr. Heath's repeated assertions in the interview that the other parties to the altercation were high on drugs that night were more explicit and remained part of the recording played for the jury.

Chief Judge Barbera has advised that she joins this opinion.