*Darrelled Westley v. State of Maryland*, No. 2474, September Term, 2019. Opinion by Fader, C.J.

**SEXUAL OFFENSES — EVIDENCE — RAPE SHIELD STATUTE — APPLICATION TO NONCONSENSUAL CONDUCT**

Maryland's Rape Shield Statute, § 3-319 of the Criminal Law Article, contains two subparts. Subsection 3-319(a) is an absolute bar to the introduction of reputation or opinion evidence concerning a victim's reputation for chastity or abstinence. Subsection 3-319(b) limits the admissibility of evidence of specific instances of a victim's prior sexual conduct. Subsection 3-319(b) applies regardless of whether the victim's prior sexual conduct at issue was willing or unwilling.

**SEXUAL OFFENSES — EVIDENCE — RAPE SHIELD STATUTE — EXCEPTIONS**

Evidence excluded by the Rape Shield Statute may nonetheless be admissible if its exclusion would violate a criminal defendant's constitutional rights.

**SEXUAL OFFENSES — CONSTITUTIONAL RIGHTS — DUE PROCESS AND CONFRONTATION CLAUSES — SEXUAL INNOCENCE INFERENCE THEORY**

In Maryland, evidence of a child victim's prior sexual abuse that is excluded by the Rape Shield Statute may not be admitted to counter a presumption of sexual innocence unless: (1) the court determines that the facts of the case give rise to a presumption of the victim's sexual innocence that if unrebutted might lead a reasonable jury to conclude that the defendant committed the crime at issue; (2) the proffered evidence would rebut that presumption; and (3) the inflammatory or prejudicial nature of the evidence does not outweigh its probative value.

Circuit Court for Wicomico County
Case No. C-22-CR-18-000440

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2474

September Term, 2019

_____

DARRELLED WESTLEY

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Ripken,
Moylan, Charles E., Jr.
 (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: July 2, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In a criminal trial of a sex crime, Maryland's rape shield statute, § 3-319 of the Criminal Law Article of the Maryland Code (2021 Repl.) (the "Rape Shield Statute"), (1) precludes the introduction of evidence concerning a victim's reputation for chastity or abstinence and (2) limits the introduction of evidence concerning specific instances of a victim's prior sexual conduct to evidence that is relevant, material, not more inflammatory or prejudicial than probative, and falls within one of four categories of evidence bearing special relevance to a defendant's case. The General Assembly's purposes in limiting admissibility of such evidence were to protect sex crime victims from the psychological trauma of being unnecessarily confronted with tangential and potentially harmful evidence, to avoid improperly shifting the focus of the trial to the victim, and to thereby encourage victims to report sex crimes. In this appeal, we are called upon to determine whether the Rape Shield Statute's protections extend to a 12-year-old victim of sexual abuse so as to preclude her alleged abuser from introducing at his criminal trial evidence that the victim had suffered another incident of sexual abuse, by a different abuser, a year earlier.

Darrelled Westley, the appellant, was convicted of multiple counts of sexual abuse of a minor, other sex offenses, and assault against his wife's niece ("Victim"), who was 12 years old at the time of the relevant events.[1] Mr. Westley argues that the circuit court erred by excluding evidence of Victim's prior sexual abuse, which he contends was necessary to rebut the jury's natural presumption that Victim would not have possessed sufficient sexual

---

[1] To preserve the anonymity of the minor victim, we will refer to her as "Victim" and to some of her relatives according to their relationships to her. *See State v. Johnson*, 440 Md. 228, 232 n.1 (2014).

knowledge to fabricate her allegations against him.  We hold that the court neither erred nor abused its discretion in excluding the evidence because it was barred by the Rape Shield Statute and unnecessary to protect Mr. Westley's constitutional rights.  In doing so, we conclude that the Rape Shield Statute's limitation on the admission of evidence of specific instances of a victim's prior sexual conduct extends to both willing and unwilling prior sexual conduct, and that the facts presented here did not raise a presumption of sexual innocence that this evidence was necessary to rebut.

Mr. Westley also contends that even if the court's decision to exclude the evidence was correct initially, the court erred by not permitting its introduction later based on the State having opened the door and pursuant to the doctrine of verbal completeness.  Because we do not agree that the State opened the door or that the doctrine of verbal completeness mandated admission of the challenged evidence, we discern no error or abuse of discretion in the court's rulings excluding it.

Finally, Mr. Westley asks this Court to reverse his conviction for child abuse by a person responsible for supervising a minor because of insufficient evidence.  We will hold that the evidence was sufficient for a reasonable jury to conclude beyond a reasonable doubt that Mr. Westley was a person responsible for supervising Victim.  Accordingly, we will affirm all of Mr. Westley's convictions.

## BACKGROUND

### Victim's Stay with the Westleys

In May 2018, Victim's mother ("Mother") asked her sister, Jessica Westley, to take care of Mother's five children for two weeks that June, while Mother and her husband

2

would both be incarcerated. Among the five siblings were Victim and her 11-year-old brother ("Brother"). Ms. Westley, who had cared for the children previously, discussed the request with her husband, Mr. Westley, and the couple then agreed to the two-week stay.

At the time, the Westleys were living in a small room, which one witness described as being half the size of the court's jury box, on the second floor of a boarding house in Salisbury. The room held, at various times, an air mattress, television, and dresser. The Westleys, the children, and an uncle—Ivan Conway, Ms. Westley's and Mother's brother—all slept together in the room. It was Mother's understanding that the Westleys would care for the children during this period, including taking them for free meals at local churches or by obtaining food from a local shelter pantry.

When Mother left prison after two weeks, she retrieved her children. At that time, Mr. Conway conveyed something to Mother that prompted her to contact Stephanie Fleming, a social worker at the Child Advocacy Center ("CAC") with whom the family was already familiar, and then bring Victim to speak with Ms. Fleming. The accusations Victim made in those interviews led to Mr. Westley's arrest and to the State charging him with two counts of sex abuse of a minor and one count each of second-degree rape, sex offense in the third degree, sex offense in the fourth degree, and assault in the second degree.

### Trial Testimony

The evidence at trial consisted of testimony by Victim, Mother, Brother, Mr. Conway, and Ms. Fleming, as well as redacted excerpts of two recorded interviews of

3

Victim conducted by Ms. Fleming. The redacted excerpts from the interviews were played for the jury and transcripts were also provided. Mr. Westley did not call any witnesses.

Victim testified that during her stay with the Westleys, she, Brother, and another sibling attended a day camp but were otherwise in the care of the Westleys. Beginning "[a] couple days after" arrival, at night while everyone else was asleep, Mr. Westley took off her clothes, touched her "butt," and used "his mouth" to touch her "private" and "boobs[.]" She also said that he used his penis to touch the "outside" of her "private," his hand to touch the "inside" and "outside" of her "private," and that sometimes the touching would occur when he followed her to the bathroom. In excerpts from the interviews with Ms. Fleming, Victim stated that the touching had occurred "[m]ore than ten" times, Mr. Westley had touched her "butt" with his penis once, and Mr. Westley's penis was brown and white "stuff was coming out" of it.

When asked who watched her children while she was in jail, Mother testified that it was "Jessica Westley and Darrelled Westley." She testified that her sister had been around the children for their entire lives, that she was familiar with caring for them, and that the children had known Mr. Westley since he and Ms. Westley married several months before their stay. Before Ms. Westley agreed that the children could stay with her and Mr. Westley, she "talked it over with her husband, so he knew about it, too." Mother expected the children to be cared for by both her sister and Mr. Westley.

Brother testified that he once saw Mr. Westley "touching on" Victim in the room while the others were sleeping. He observed Mr. Westley touching Victim's "butt" and

4

"titties" while she "was kind of awoke . . . [a]nd kind of asleep." The day after he observed that conduct, Brother reported it to Mr. Conway.

Mr. Conway testified that he had slept on the floor in the same room with the Westleys and the children, and, on at least one occasion, he saw Victim go to the bathroom with Mr. Westley following shortly after. Mr. Conway described how one day after work, Brother told him about Mr. Westley's conduct with Victim. Mr. Conway then decided to stay at the residence "the entire time after that information came out because [Victim] was afraid to be alone during the day." Mr. Conway confronted Mr. Westley about the accusations but was satisfied by Mr. Westley's assurances that nothing had happened.

Victim's description of Mr. Westley's conduct varied between her trial testimony and her recorded statements to Ms. Fleming. For example, although Victim testified at trial that Mr. Westley had touched the "outside" of her "private" with his penis and described Mr. Westley touching her in the bathroom, in her interviews with Ms. Fleming the only body part she mentioned Mr. Westley touching with his penis was her "butt," and she described incidents occurring only on the bedroom floor. And at one CAC interview, but not at trial, Victim stated that Mr. Westley had put his tongue inside her vagina "[e]very night."

At the conclusion of the State's case, the court denied Mr. Westley's motion for judgment of acquittal on all counts but determined that there was insufficient evidence to

5

instruct the jury that it could premise a conviction for second-degree rape on a use of force.[2] The jury returned a verdict of guilty on all counts except for second-degree rape.

### *Excluded Evidence of Prior Sexual Abuse*

Before trial, the State moved in limine to preclude Mr. Westley from presenting evidence about prior sexual abuse of Victim by a different uncle, Charles Darnell Quails. The prosecutor stated that the disputed evidence would show that Mr. Quails abused Victim and Mr. Quails's daughter, another minor, over the course of several weekends during the summer before Mr. Westley's alleged acts, when Victim was 11 years old. Before her stay with the Westleys, Victim had met with Ms. Fleming at the CAC and reported that Mr. Quails had touched her breasts and private parts, rubbed his penis on her bottom, used his mouth on her, and put his penis inside her private parts.[3]

In its written motion, the State argued that the Rape Shield Statute barred presentation of the prior abuse evidence. However, in arguments before the motions court, the State retreated from its reliance on the Rape Shield Statute, stating that it had come to consider the statute inapplicable to prior nonconsensual sexual conduct based on this Court's holding in *Shand v. State*, 103 Md. App. 465, 480-81 (1995) ("*Shand I*"), *aff'd*, 341 Md. 661 (1996). Nonetheless, the State argued that the statute's spirit should guide the court and that the evidence should be excluded under traditional evidentiary rules

---

[2] A charge of second-degree rape requires proof of vaginal intercourse or a sexual act combined with at least one of three factors, one of which is the use of force. Crim. Law § 3-304(a)(1). Another is where the victim is under 14 years old and more than four years younger than the perpetrator. *Id.* § 3-304(a)(3). The court permitted the charge to go forward based on the latter factor.

[3] Mr. Quails's criminal case was pending at the time of Mr. Westley's trial.

because it was irrelevant and the risk of unfair prejudice substantially outweighed any possible probative value.

Mr. Westley agreed that the Rape Shield Statute was inapplicable. He further argued that the testimony was admissible under traditional evidentiary rules and was essential to his defense. He contended that based on the similar allegations against the two men, the evidence would establish that Victim had an independent basis of sexual knowledge on which she could have relied to formulate the graphic allegations against Mr. Westley, making it more likely that she fabricated her present accusations.

The motions court granted the State's motion and excluded the evidence. It accepted the parties' shared position that the Rape Shield Statute did not apply to nonconsensual acts. The court concluded, however, that the proffered evidence was not relevant and even if it were, that the danger of unfair prejudice substantially outweighed any probative value. The court acknowledged the possibility that the evidence could be admitted at trial if "there's evidence presented that opens the door for [i]t to be used," but that would be a question for the trial judge.

During trial, Mr. Westley twice moved to admit the excluded evidence based on the State's introduction of evidence that Victim had met with Ms. Fleming before the incident involving Mr. Westley. The trial court denied both motions. Background relating to those motions and the court's disposition of them will be provided below.

Following his convictions, Mr. Westley filed this timely appeal.

**DISCUSSION**

Mr. Westley challenges the court's grant of the State's motion in limine to exclude evidence about Victim's prior abuse as well as the trial court's continued refusal to admit the same evidence after the State allegedly opened the door. Separately, he argues that the evidence was insufficient to support his conviction for child abuse by a person responsible for supervising a minor. We discern no error or abuse of discretion in the court's evidentiary rulings and conclude that the evidence was sufficient to sustain his conviction. Accordingly, we will affirm.

## I. MARYLAND'S RAPE SHIELD STATUTE APPLIES TO EVIDENCE OF PRIOR ABUSE.

Mr. Westley, the State, and ultimately the circuit court all agreed that pursuant to this Court's decision in *Shand I*, Maryland's Rape Shield Statute is applicable only to evidence of prior *willing* sexual conduct and that the statute was therefore inapplicable to the evidence of sexual abuse at issue here. On appeal, the State argues that the Rape Shield Statute is not so limited and that it provides the proper framework for analyzing the admissibility of the disputed evidence. We agree that the Rape Shield Statute applies. As we will explain, to the extent *Shand I* could be interpreted as Mr. Westley does, the reasoning of that decision did not survive the Court of Appeals' further review in that case. *See Shand v. State*, 341 Md. 661 (1996) ("*Shand II*"). First, however, we must begin with an exploration of the Rape Shield Statute itself and its relevant legislative history. Ultimately, based on our review of *Shand I* and *II*, the statute, and its legislative history,

we will conclude that the Rape Shield Statute applies to a victim's prior sexual conduct regardless of whether such conduct was willing.[4]

Maryland's Rape Shield Statute, currently codified at § 3-319 of the Criminal Law Article, establishes rules for the admission of certain types of evidence in criminal prosecutions for sex crimes.[5] The statute, originally enacted in 1976 and most recently amended in 2003, addresses two types of evidence. First, subsection (a) provides an absolute bar on the admission of "[e]vidence relating to a victim's reputation for chastity or abstinence and opinion evidence relating to a victim's chastity or abstinence[.]" Second, subsection (b) addresses "[e]vidence of a specific instance of a victim's prior sexual conduct," which is admissible only if the judge finds that:

>  (1) the evidence is relevant;
>
>  (2) the evidence is material to a fact in issue in the case;
>
>  (3) the inflammatory or prejudicial nature of the evidence does not outweigh its probative value; and
>
>  (4) the evidence:
>
>>  (i) is of the victim's past sexual conduct with the defendant;

---

[4] As a general matter, it would seem to be beyond reasonable dispute that a nonconsensual sexual encounter constitutes "sexual conduct" by someone—at a minimum, by the perpetrator. The question with which we are concerned is whether such an act constitutes the "victim's . . . sexual conduct."

[5] The statute applies in prosecutions for all sexual crimes specified in Subtitle 3 of Title 3 of the Criminal Law Article (including, among others, first-degree and second-degree rape, third-degree and fourth-degree sexual offenses, first-degree and second-degree attempted rape, unnatural or perverted sexual offenses, incest, and sexual solicitation of a minor), as well as for sexual abuse of a minor, sexual abuse of a vulnerable adult, and lesser included offenses. *See* Crim. Law §§ 3-319(a), (b).

> (ii) is of a specific instance of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma;
>
> (iii) supports a claim that the victim has an ulterior motive to accuse the defendant of the crime; or
>
> (iv) is offered for impeachment after the prosecutor has put the victim's prior sexual conduct in issue.

Crim. Law § 3-319(b). The statute thus treats evidence concerning a victim's reputation for chastity or abstinence—which is always prohibited—differently from evidence of specific instances of the victim's prior sexual conduct—which is admissible under limited circumstances.

Here, the determination of whether evidence of Victim's prior abuse fell within the scope of subsection (b) of the Rape Shield Statute turns on whether it is evidence of her "prior sexual conduct." Resolving that question is a matter of statutory interpretation, the goal of which "is to discern and carry out the intent of the Legislature." *Aleman v. State*, 469 Md. 397, 421 (2020). To achieve that goal, "[w]e begin with an examination of the text of a statute within the context of the statutory scheme to which it belongs, then typically review the legislative history to confirm conclusions or resolve ambiguities, and finally may consider the consequences of alternative interpretations of the statute." *Id.*

In our interpretation, we "first look[] to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Berry v. Queen*, 469 Md. 674, 687 (2020) (quoting *Brown v. State*, 454 Md. 546, 551 (2017)). In so doing, "[o]ur inquiry is not confined to the specific statutory provision at issue on appeal. Instead,

10

'[t]he plain language must be viewed within the context of the statutory scheme to which it belongs[.]'" *Berry*, 469 Md. at 687 (internal citation and some quotation marks omitted) (quoting *Johnson v. State*, 467 Md. 362, 372 (2020)). That context may include the statute's "relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case." *Berry*, 469 Md. at 687 (quoting *Blackstone v. Sharma*, 461 Md. 87, 114 (2018)).

A statute may be ambiguous in two ways. One is "when the 'words of a statute are . . . subject to more than one reasonable interpretation[.]'" *Blackstone*, 461 Md. at 113 (quoting *State v. Bey*, 452 Md. 255, 266 (2017)). The other is "where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme[.]" *Id.* In either case, "a court must resolve the ambiguity by searching for legislative intent in other indicia," *id.*, which may include:

> the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions.

*Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 295 (2017) (quoting *Bellard v. State*, 452 Md. 467, 482 (2017)). In addition, we must "consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common

11

sense." *Blackstone*, 461 Md. at 114 (quoting *Spangler v. McQuitty*, 449 Md. 33, 50 (2016)).

### A.      Plain Meaning of Criminal Law § 3-319

We begin with the text.  The Rape Shield Statute does not define "prior sexual conduct[.]"  We therefore look to dictionary definitions, which provide "an essential starting point because the 'ordinary, popular understanding of the English language dictates interpretation of [the statute's] terminology.'"  *Berry*, 469 Md. at 688-89 (alteration in original) (quoting *Johnson*, 467 Md. at 372); *see also Couret-Rios v. Fire & Police Employees' Ret. Sys. of City of Baltimore*, 468 Md. 508, 530 n.8 (2020) ("Although dictionary definitions do not provide dispositive resolutions of the meaning of statutory terms, dictionaries do provide a useful starting point for determining what statutory terms mean, at least in the abstract, by suggesting what the legislature could have meant by using particular terms." (quoting *Marriott Emps. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 447 (1997))).

The word "prior," as relevant here, means "earlier in time or order."  *Prior*, Merriam-Webster's Collegiate Dictionary 988 (11th ed. 2003).

The word "sexual" is not defined independently in the statute, but Criminal Law § 3-301, which lists definitions applicable to all of Subtitle 3, sheds light on the General Assembly's understanding of the modifier by defining the terms "sexual act" and "sexual contact."  A "sexual act," as defined in § 3-301(d), means analingus, cunnilingus, fellatio, anal intercourse, or an act involving penetration of a genital opening or anus that is

12

performed for sexual arousal, gratification, or abuse.[6]  "Sexual contact," as defined in § 3-301(e), is "an intentional touching of the victim's or actor's genital, anal, or other intimate area for sexual arousal or gratification, or for the abuse of either party."  These definitions are consistent with those provided in dictionaries for the word "sexual," such as "relating to the instincts, physiological processes, and activities connected with physical attraction or intimate physical contact between individuals[.]"  *Sexual*, New Oxford American Dictionary 1601 (3d ed. 2010); *see also Sexual*, Merriam-Webster's Collegiate Dictionary 1141 ("of, relating to, or associated with sex or the sexes" and "having or involving sex").

"Conduct" is also not defined in the statute.  Black's Law Dictionary defines "conduct" as "[p]ersonal behavior, whether by action or inaction, verbal or nonverbal[.]"  *Conduct*, Black's Law Dictionary 369 (11th ed. 2019).  Black's also provides several additional definitions with modifiers, including "active conduct," which is "[b]ehavior that involves a person doing something by exerting will on the external world," and "passive conduct," which is "[b]ehavior that does not involve exerting will on the external world."  *Id.* at 369-70.  Other dictionaries define conduct, when used as a noun, as "the manner in which a person behaves, esp[ecially] on a particular occasion or in a particular context,"  *Conduct*, New Oxford American Dictionary 362, or as "a mode or standard of personal

---

[6] The statutory definition of "sexual act" expressly excludes "vaginal intercourse."  Crim. Law § 3-301(d)(2).  That is not because the General Assembly does not consider vaginal intercourse to be a sexual act, but because it lists vaginal intercourse separately in statutes criminalizing sexual offenses.  *See, e.g.*, *id.* § 3-303(a)(1)(i) & (ii) (criminalizing both nonconsensual vaginal intercourse and a nonconsensual sexual act with another by force or threat of force).

13

behavior esp[ecially] as based on moral principles," *Conduct*, Merriam-Webster's Collegiate Dictionary 259. Those definitions of "conduct" include behavior that can be either active or passive.

Because definitions of "conduct" generally incorporate "behavior," we also consider definitions of that word. Behavior is defined as "the way in which one acts or conducts oneself, esp[ecially] toward others," "the way in which an animal or person acts in response to a particular situation or stimulus," *Behavior*, New Oxford American Dictionary 150; or "the manner of conducting oneself," "anything that an organism does involving action and response to stimulation," and "the response of an individual, group, or species to its environment," *Behavior*, Merriam-Webster's Collegiate Dictionary 111. These definitions include actions engaged in both volitionally and in response to external stimuli, thus suggesting that the concept encompasses both willing and unwilling actions.

In analyzing the plain language of a statute, we do not view the words in a vacuum. Instead, "[t]he plain language 'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute.'" *Johnson*, 467 Md. at 372 (quoting *State v. Johnson*, 415 Md. 413, 421 (2010)). These "become[] the context within which we read the particular language before us in a given case." *Neal v. Baltimore City Bd. of Sch. Comm'rs*, 467 Md. 399, 415 (2020) (quoting *Blackstone*, 461 Md. at 114). Accordingly, we find it notable that the Rape Shield Statute addresses two different categories of evidence. Subsection (a) concerns general reputation or opinion evidence concerning a victim's chastity or abstinence, which the General Assembly has determined to be categorically inadmissible. We can presume that

14

such evidence, which is not necessarily tied to any specific instance of conduct, would necessarily be limited in scope to a victim's reputation for engaging in sexual activity willingly, because unwilling engagement would not reflect at all on chastity or abstinence.

Subsection (b), by contrast, is concerned not with reputation or opinion evidence but with evidence of the occurrence of "a specific instance of a victim's prior sexual conduct," which we will refer to as "specific instances evidence." Structurally, subsection (b) stands independent of subsection (a) in that it addresses a different type of evidence.[7] The two subsections are complementary, to be sure, but they do not overlap. Unlike subsection (a), there is nothing inherent in the provisions of subsection (b) that would limit its scope to willing conduct. To the contrary, some of the enumerated instances in which evidence of sexual conduct may be admitted pursuant to the statute necessarily apply without regard to whether the prior conduct was willing, including a "specific instance of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma[.]" Crim. Law § 3-319(b)(4)(ii). All four of these "source or origin" rationales can be the result of unwilling or willing sexual activity. Trauma, moreover, would appear to be even more likely to be associated with unwilling activity. Similarly, an attempt to cover up an unwilling, prior sexual assault by a family member or friend could be the source of a victim's "ulterior motive to accuse the defendant of the crime[.]" *See id.* § 3-319(b)(4)(iii). Of course, that the exceptions to the general prohibition against introduction of specific

---

[7] As we will discuss below, when the Rape Shield Statute was initially enacted, these two provisions appeared in separate sentences within the same paragraph. Nonetheless, this court interpreted them as independent provisions. *See Lucado v. State*, 40 Md. App. 25, 32-33 (1978).

15

instances evidence could apply equally to willing and unwilling sexual activities does not mean that the prohibition itself necessarily covers both types of activities, but it is significant that nothing in the language or structure of subsection (b) itself is indicative of an intent to limit the prohibition only to evidence of willing engagement in sexual activities.

It is also notable that § 3-319(b)(4)(ii) uses the phrase "sexual activity" to identify the scope of actions covered by that exception. Although that term is not separately defined in the statute, the term "sexual act" is defined to include acts that can be engaged in willingly or unwillingly. *Id.* § 3-301(d). In *Shand II*, the Court of Appeals placed significance on the General Assembly's use of different terms in the statute, including "sexual contact," "sexual activity," and "sexual conduct." 341 Md. at 676. The Court observed that "sexual conduct" was a "more general concept" than "sexual activity," *id.* at 675-76, and concluded that "[a]t a minimum, we do no violence to the legislative intent . . . when we construe 'sexual conduct' to embrace a wider range of activity than 'physical contact,'" *id.* at 677. Because the narrower term, "sexual activity," clearly can include nonconsensual activity, there is no logical reason why the "more general" term, "sexual conduct," should be read as more restrictive when it comes to consent.

Read in conjunction with the context and structure of § 3-319, the plain language of the statute suggests that "prior sexual conduct" is not limited only to willing sexual conduct. Nonetheless, we will turn next to consider the applicable legislative history.

### B. Legislative History

The Rape Shield Statute was originally enacted in 1976 primarily in response to trial courts of the time sometimes admitting evidence of a victim's lack of chastity in rape cases

when consent was a defense. *See Johnson v. State*, 332 Md. 456, 464 (1993) (listing examples of such cases, including *Giles v. State*, 229 Md. 370, 379-80 (1962), *vacated and remanded on other grounds*, 386 U.S. 66 (1967), and *Humphries v. State*, 227 Md. 115, 121 (1961)). The Court of Appeals subsequently identified two purposes of the Rape Shield Statute as: (1) "to protect rape victims from unscrupulous defense attorneys who try to shift the focus away from their clients and onto the victims"; and (2) "to encourage more victims to report the crimes and help bring rapists to justice." *White v. State*, 324 Md. 626, 633-34 (1991). The Court favorably quoted the Mississippi Supreme Court's statement that such laws

> reflect[] recognition that the trial process at best is traumatic to the victim of sexual abuse. If [victims have] reason to believe the most intimate details of [their] li[ves] are going to be bandied about the courtroom, many victims will decide the game is not worth the candle and decline to file a complaint.

*Id.* at 634 (quoting *Goodson v. State*, 566 So. 2d 1142, 1149-50 (Miss. 1990)).

The Report of the Senate Judicial Proceedings Committee on Senate Bill 399 identifies the purpose of the bill as

> to preclude admission into evidence of opinion and reputation evidence as to the chastity of the victim of a sexual offense; and to limit the admission of evidence concerning specific instances of the victim's prior sexual conduct; and thereby lessen the likelihood of exacerbating the psychological injury already suffered by the victim of a sexual offense.

Report of Md. Senate Judicial Proceedings Committee on Senate Bill No. 399, at 1 (1976) ("Report of S.B. 399").[8] That statement indicates that the dual elements of the bill—

---

[8] Both chambers of the General Assembly introduced rape shield legislation in the same session, and both ultimately passed substantially identical bills. *See* Senate Bill 399

17

excluding opinion and reputation evidence and limiting the admission of specific instances evidence—were both intended to reduce the trauma of victims of sexual offense during the trial process. The report cited then-State Senator Steny Hoyer, Chair of the special committee whose efforts led to the legislation, as identifying that the bill addressed "the plight of the victim of a rape," a large number of whom did not report the offenses. *Id.* at 2. The framers of the law intended that the "[d]iminution of degrading practices subsequent to the report of a rape would result in a greater willingness of a victim to seek criminal redress against the attacker." *Id.*

According to the Senate Report, only the prohibition on use of reputation or opinion evidence concerning chastity or abstinence and the procedural requirements for use of specific instances evidence were new. *Id.* at 2, 3. The Report noted that the exceptions to the general limitation against use of specific instances evidence "presently exist[ed] in case law[.]" *Id.* at 1; *see also* J. William Pitcher, *Legislation: Rape and Other Sexual Offense Law Reform in Maryland — 1976-1977*, 7 U. Balt. L. Rev. 151, 156 (1977) ("The list of exceptions to the ban on evidence of specific instances of the victim's prior sexual activities was, in reality, a codification of the common law, and thus constituted no substantive change."). Nonetheless, the committee's identification of the new law's benefits appeared to focus more on the benefits of limiting specific instances evidence. Among other observations, the committee said that "limiting evidence relating to prior sexual conduct of

_____

(1976) & House Bill 715 (1976). Governor Marvin Mandel signed the House Bill and vetoed the Senate's.

a rape victim . . . would probably result in an increase in the percentage of rapes reported."

Report of S.B. 399, at 4.  It also found

> that a statutory response to the inherent sensitivities of a traumatized victim could accommodate the constitutionally mandated rights and protections properly afforded a defendant in our criminal justice system; and that the weighing of inflammatory nature <u>versus</u> the probative value of evidence of specific instances of prior sexual conduct precludes possible admission of highly prejudicial evidence of limited probative value.

*Id.*[9]

The legislative history reflects that the General Assembly intended to protect victims of sexual offenses from the introduction of humiliating evidence about their past, except in the rare circumstances when such evidence was necessary to a defendant's legitimate defense, for the purposes of:  (1) encouraging victims of sex crimes to report them; (2) avoiding further trauma to victims who do report such crimes; and (3) avoiding

---

[9] Section 3-319 was most recently amended in 2003, when the General Assembly extended its scope to prosecutions for sexual abuse of a child.  *See generally* 2003 Md. Laws ch. 89 § 1; *see also* Lynn McLain, 5 Maryland Evidence § 412:1 (2020).  The State argues that this amendment provides additional support for interpreting "prior sexual conduct" to include nonconsensual conduct because sexual acts involving children often, by definition, occur before the legal age of consent.  It is true that the age of consent for sexual activity generally in Maryland is 16, and that it is illegal for someone more than four years older than a 14- or 15-year-old to engage sexually with that minor.  *See generally* Crim. Law §§ 3-304(a)(3) (second-degree rape); 3-307(a)(3), (4) & (5) (sexual offense in the third degree); 3-308(b)(2) & (3) (sexual offense in the fourth degree); 3-315 (continuing course of conduct with a child).  Interpreting the statute not to reach nonconsensual sexual conduct would thus preclude its use in all child sexual abuse cases involving a victim under the age of 14 and some cases involving older victims.  Because we see no evidence in the legislative history to suggest an intent to significantly limit the effect of the amendment, we agree that the amendment provides further support for our conclusion that the General Assembly intended the Rape Shield Statute to apply to evidence of unwilling sexual activity.  At a minimum, the amendment does not in any way undermine our prior legislative history analysis.

19

confusing juries and diverting their attention from the defendant's guilt or innocence with the introduction of evidence of limited or no probative value, but which is highly prejudicial or inflammatory.

Each of these purposes is served by interpreting the scope of "prior sexual conduct" to include unwilling sexual conduct. To be sure, the prospect that reporting a sexual crime could force a victim to relive on the witness stand the circumstances of a prior sexual crime would discourage victims from coming forward. And the risk of jury confusion from the introduction in one sexual offense trial of evidence of a different sex crime by another perpetrator is great. Moreover, we recognize the argument that some victims of prior abuse or rape may be uniquely prone to psychological harm by exposing that history in public. *See* Pitcher, *supra*, at 163 (stating that one goal demonstrated by the legislative debate in enacting the original bill was to "lessen[] the likelihood of exacerbating the psychological injury already suffered"). We also doubt that the General Assembly might have believed a victim's privacy and reputation would be worth protecting when engaging in willful sexual conduct but not when such conduct was forced upon the victim.[10]

---

[10] We note that many other jurisdictions have interpreted their own rape shield laws, which sometimes use different language, to apply to nonconsensual conduct. *See, e.g.*, *State v. Jeffries*, 156 N.E.3d 859, 861 (Ohio 2020), *cert. denied*, 141 S. Ct. 1085 (2021) ("We hold that Ohio's rape-shield law unambiguously applies to both consensual and nonconsensual sexual activity."); *State v. Jones*, 490 N.W.2d 787, 790 (Iowa 1992) (holding that the term "sexual behavior" includes a victim's past sexual abuse under Iowa law), *overruled on other grounds by State v. Plain*, 898 N.W.2d 801 (Iowa 2017); *State v. Pulizzano*, 456 N.W.2d 325, 329 (Wis. 1990) ("The prior sexual assault M.D. experienced clearly constitutes 'sexual conduct' as that term is defined in [the rape shield statute]."); *Commonwealth v. Ruffen*, 507 N.E.2d 684, 688 (Mass. 1987) (recognizing that evidence of victim's prior sexual abuse would typically be barred by rape shield statute unless defendant's constitutional rights necessitate its admission); *State v. Jacques*, 558 A.2d 706,

20

Our review of legislative history thus adds support to our conclusion that the Rape Shield Statute's specific instances provision applies to both willing and unwilling sexual conduct.

## C.     *Shand I* and *Shand II*

Mr. Westley's primary argument that the Rape Shield Statute applies only to willing sexual conduct is premised on this Court's statement in *Shand I* "that 'sexual conduct,' as that term is used in Maryland's Rape Shield Law, requires physical contact indicating a willingness to engage in either vaginal intercourse or a sexual act." 103 Md. App. at 480-81 (footnotes omitted). Even if Mr. Westley properly interprets that statement—and, as we explain below, we are not convinced that he does—the Court of Appeals' decision in *Shand II* rejected the reasoning underlying his interpretation of it. Explaining why requires further exploration of the decisions.

In *Shand I*, the defendant in a rape prosecution sought to introduce evidence that two weeks before the alleged rape, the victim had offered to exchange sex with the

707 n.2 (Me. 1989) ("We reject, as providing insufficient protection to victims, the defendant's proposed interpretation of 'sexual behavior' to apply only to a victim's 'volitional sexual behavior.'"); *State v. Muyingo*, 15 P.3d 83, 87 (Or. Ct. App. 2000) (stating that "'[p]ast sexual behavior' means a volitional or non-volitional physical act" and holding that evidence of the prior rape of the complaining witness fell within the meaning of past sexual behavior under Oregon rape shield statute (quoting *State v. Wright*, 776 P.2d 1294, 1297-98 (Or. Ct. App. 1989))); *see generally Grant v. Demskie*, 75 F. Supp. 2d 201, 211-12 (S.D.N.Y. 1999) ("The majority of states view prior rape or sexual abuse of a child as 'sexual conduct' within the ambit of state rape shield laws. . . . On the other hand, a minority of states hold that prior rape or sexual abuse of a child is not evidence of unchastity and therefore is not 'sexual conduct' within the ambit of state rape shield laws.") (collecting cases). *But see State v. Markle*, 823 P.2d 1101, 1109 (Wash. 1992) (holding that evidence of victim's prior sexual abuse was not within rape shield definition of prior sexual activity).

21

defendant for drugs. *Id.* at 477. The defendant argued that the evidence was admissible as "[e]vidence of the victim's past sexual conduct with the defendant"—one of the four exceptions to the application of the Rape Shield Statute's specific instances limitation[11]—in support of his contention that the purported rape was consensual. *Id.* at 474, 477-78. This Court, citing the Court of Appeals' decision in *White v. State*, concluded that to be admissible as a "specific instance[] of a victim's prior sexual conduct" with the defendant, *id.* at 480 (quoting *White*, 324 Md. at 636), the evidence had to have "special relevance to

---

[11] At the time relevant in *Shand*, the Rape Shield Statute was codified in § 461A of Article 27 of the Maryland Code. For our purposes, the primary difference between § 461A and the current § 3-319 is organizational. The prior text provided:

> (a) *Evidence relating to victim's chastity.*—Evidence relating to a victim's reputation for chastity and opinion evidence relating to a victim's chastity are not admissible in any prosecution for commission of a rape or sexual offense in the first or second degree. Evidence of specific instances of the victim's prior sexual conduct may be admitted only if the judge finds the evidence is relevant and is material to a fact in issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value, and if the evidence is:
>
> > (1) Evidence of the victim's past sexual conduct with the defendant; or
> >
> > (2) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, disease, or trauma; or
> >
> > (3) Evidence which supports a claim that the victim has an ulterior motive in accusing the defendant of the crime; or
> >
> > (4) Evidence offered for the purpose of impeachment when the prosecutor puts the victim's prior sexual conduct in issue.
>
> (b) *In camera hearing.*—Any evidence described in subsection (a) of this section, may not be referred to in any statements to a jury nor introduced at trial without the court holding a prior in camera hearing to determine the admissibility of the evidence[.]

*Shand II*, 341 Md. at 664 n.2 (quoting Md. Code Ann., Art. 27 § 461A).

the defense of consent," *Shand I*, 103 Md. App. at 480. And to have special relevance to the defense of consent, the Court reasoned that prior sexual conduct had to involve "physical contact indicating a willingness to engage in either vaginal intercourse or a sexual act." *Id.* at 480-81 (footnotes omitted). Because a verbal offer to exchange sex for drugs did not involve physical conduct, the Court held, it was not specific instances evidence subject to that provision and, therefore, it was not admissible under the exception applicable to "past sexual conduct with the defendant[.]" *Id.* at 481-82.

The Court proceeded to analyze whether the evidence could nonetheless constitute reputation or opinion evidence and be excluded on that basis. Although the Court acknowledged that it had previously held that specific instances evidence was not within the scope of the statute's provision addressing reputation or opinion evidence, *id.* at 482-83 (citing *Lucado v. State*, 40 Md. App. 25, 39 (1978)), the Court was not satisfied that that distinction served the legislative purpose of avoiding humiliation of victims of sexual crimes and encouraging them to come forward, *Shand I*, 103 Md. App. at 483. To address that deficiency, the Court crafted an exception to allow the exclusion of "evidence of specific instances not involving physical contact indicating a willingness to engage in vaginal intercourse or a sexual act . . . as evidence relating to a victim's chastity." *Id.* In doing so, the Court effectively enlarged the scope of the prohibition against admission of reputation or opinion evidence to include the specific instances evidence that it had just determined fell outside the scope of the specific instances provision itself.

The Court of Appeals agreed on the ultimate outcome—that the circuit court had been correct to exclude the proffered evidence—but on a different rationale. Before

23

addressing the scope of either subsection of the Rape Shield Statute, the Court determined that the proffered evidence was irrelevant even under traditional evidentiary principles because there had been no evidence introduced of an exchange of sex for drugs on the night of the rape. *Shand II*, 341 Md. at 673. Absent such a basis, the Court discerned that evidence that the victim had previously offered or entertained such an exchange was irrelevant and so was properly excluded. *Id.*

The Court then turned to this Court's decision, which it found incorrect in two respects: (1) in "constru[ing] 'sexual conduct' in the Statute to require physical contact indicating a willingness to engage in either vaginal intercourse . . . or a sexual act"; and (2) in "constru[ing] the Statute's prohibition against reputation and opinion evidence as to chastity to include specific acts." *Id.* at 674-75. The Court provided no further discussion or analysis with respect to the second error, but it seems apparent that the Court viewed the two provisions of the Rape Shield Statute as distinct, with one addressing reputation and opinion evidence and the other covering specific instances evidence.

With respect to the first error, looking to dictionary definitions of "conduct,"[12] the Court concluded that "[t]he act of *making an offer* to another person is certainly conduct"

---

[12] The dictionary definitions the Court considered are similar to those we cited above:

> The word "conduct" is defined as "behavior in a particular situation or relation or on a specified occasion." *Webster's Third New International Dictionary* 474 (1976). "Conduct" is: "[p]ersonal behavior; deportment; mode of action; any positive or negative act." *Black's Law Dictionary* 268 (5th ed. 1979).

*Shand II*, 341 Md. at 675 (alteration in original).

24

and that an offer to engage in sexual activity can constitute sexual conduct. *Id.* at 675. The Court also viewed as significant the General Assembly's choice of the word "conduct," rather than other phrases used elsewhere in the statute that had "strong[er] physical connotations." *Id.* at 675-76. After citing several cases from other jurisdictions reaching the same conclusion, the Court held that "sexual conduct" need not be physical and that an offer to exchange sex for drugs was "sexual conduct" subject to analysis under the Rape Shield Statute. *Id.* at 677-80.

Mr. Westley contends that because the Court of Appeals in *Shand II* did not expressly disavow this Court's statement that evidence of "sexual conduct" necessarily must indicate a "willingness to engage in vaginal intercourse or a sexual act," *Shand I*, 103 Md. App. at 483, this Court remains bound by that interpretation of the statute. We disagree. In identifying this Court's two errors in interpreting the Rape Shield Statute, the Court of Appeals described the first as "constru[ing] 'sexual conduct' in the Statute to require physical contact indicating a willingness to engage in either vaginal intercourse . . . or a sexual act[.]" *Shand II*, 341 Md. at 674-75. Although the Court's subsequent discussion focused on the "physical contact" aspect of that construction—which was the only aspect that was relevant there—the disagreement applied to the entire construction. That construction thus did not survive *Shand II*.

Furthermore, even if *Shand II* had not resolved the issue, it is not clear to us that Mr. Westley's interpretation of the construction in *Shand I* would have been correct. Notably, this Court's statement in *Shand I* was made in the context of analyzing whether the evidence of an offer to trade sex for drugs fell within the statute's *exception* for specific

25

instances of sexual conduct evidence pertaining to "the victim's past sexual conduct with the defendant[.]" 103 Md. App. at 474, 478. It was in that context that this Court understandably construed "sexual conduct" as needing to have "special relevance to the defense of consent." *Id.* at 480. We have no qualms with that conclusion as it pertains to the exception for consent. As explained above, however, we see no reason to read any such limitation into the phrase "prior sexual conduct" outside the context of that exception, and we find it notable that the statute's three other exceptions have no necessary link to consent. *Shand I* thus does not require us to interpret "prior sexual conduct" as limited only to conduct in which the victim has willingly engaged.

In sum, we hold that based on the plain language, purpose, and context of the Rape Shield Statute, "prior sexual conduct" within the scope of subsection (b) includes all sexual conduct, whether willing or not.

**II.     THE RAPE SHIELD STATUTE PRECLUDED EVIDENCE OF VICTIM'S PRIOR ABUSE AND EXCLUSION OF THAT EVIDENCE DID NOT VIOLATE MR. WESTLEY'S CONSTITUTIONAL RIGHTS.**

Turning back to our case, because evidence of Victim's prior assault by Mr. Quails was evidence of "a specific instance of a victim's prior sexual conduct," and Mr. Westley sought to admit it in his prosecution for sexual abuse of a minor, the evidence should have been analyzed under the framework of the Rape Shield Statute. To be admissible under the statute, prior evidence of sexual conduct must meet each of four criteria. It must: (1) be relevant; (2) be material; (3) have probative value that is not outweighed by its inflammatory or prejudicial nature; and (4) fit within one of four identified exceptions. *See*

26

Crim. Law § 3-319(b). We conclude that the proffered evidence meets none of those requirements and that preclusion does not violate Mr. Westley's constitutional rights.

### A. The Rape Shield Statute Precluded Evidence of Victim's Prior Abuse.

We will address the somewhat more involved issues of relevance and prejudice further below, but it is sufficient to resolve the statutory question to note that the evidence of Victim's prior assault by Mr. Quails is not admissible under the Rape Shield Statute because it does not fit within any of the four exceptions that would permit its introduction as Victim's "prior sexual conduct." The prior abuse evidence (i) did not involve sexual conduct with Mr. Westley; (ii) did not reveal the source or origin of semen, pregnancy, disease, or trauma; (iii) was not alleged to support a claim of an ulterior motive to accuse Mr. Westley; and (iv) was not offered for impeachment after the prosecutor put Victim's prior sexual conduct in issue. *See* Crim. Law § 3-319(b)(4). Lacking an applicable exception, the evidence of Victim's prior sexual conduct was inadmissible under the Rape Shield Statute.

That conclusion, however, does not end our inquiry, because Mr. Westley contends that excluding the evidence violated his constitutional rights to due process and to confront his accuser. If he is correct, then the Rape Shield Statute could not stand in the way of him introducing the evidence in his own defense. We turn now to that contention.

### B. Mr. Westley Did Not Have a Constitutional Right to Introduce Evidence of Victim's Prior Sexual Assault.

Mr. Westley contends that he had a constitutional right to present evidence of Victim's prior sexual assault because that evidence was necessary to rebut a presumption

27

of sexual innocence that the jury would naturally hold; that is, a presumption by the jury that Victim, at 12 years old, "was too sexually innocent to fabricate the charges, which in turn would have made it possible, and therefore more likely, that she fabricated them." As discussed further below, we hold that before admitting such evidence, a court must assess on a case-by-case basis whether the exclusion of such evidence would violate the defendant's constitutional rights. The first step in that analysis requires an assessment of whether the facts of the case actually give rise to a presumption of sexual innocence. If so, the court must then determine whether the evidence proffered actually rebuts the presumption. Finally, the court must assess whether the prejudicial or inflammatory nature of the evidence outweighs its probative value. Here, because we conclude that the facts did not give rise to a presumption of sexual innocence, we conclude that the evidence was not relevant and the trial court correctly precluded it.

The four circumstances in which specific instances of a victim's prior sexual conduct may be admitted under § 3-319(b), in combination with the statute's balancing test, are intended to accommodate a defendant's constitutional rights while protecting the victim. *See Johnson v. State*, 332 Md. 456, 465 (1993) (describing legislative intent in passing the Rape Shield Statute). However, when a limitation on the admissibility of evidence under the Rape Shield Statute conflicts with a defendant's constitutional rights, the law's restrictions must give way. *See Thomas v. State*, 301 Md. 294, 318 (1984) ("[R]ape shield laws may not be used to exclude probative evidence in violation of a defendant's constitutional rights of confrontation and due process.").

By potentially limiting a defendant's case, rape shield statutes can collide with a defendant's right to confront one's accuser and the right to due process. The right to due process derives in part from a criminal defendant's implicit constitutional right to testify in his or her own defense. *United States v. Dunnigan*, 507 U.S. 87, 96 (1993); *Dallas v. State*, 413 Md. 569, 588-90 (2010) (Bell, C.J., concurring in part) (recognizing the same right applies in Maryland courts). For purposes of state criminal proceedings, the right to testify arises out of the Fourteenth Amendment's Due Process Clause. "[I]n plain terms[,] the right to present a defense [is] the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Allen v. State*, 440 Md. 643, 677 (2014) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." (quoting *Foster v. State*, 297 Md. 191, 203 (1983))). The Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights provide a criminal defendant the right to confront one's accuser and any witness testifying against that defendant. *See Michigan v. Lucas*, 500 U.S. 145, 149 (1991); *Derr v. State*, 434 Md. 88, 103 (2013). That right, like the Fifth and Fourteenth Amendment due process right, also provides that a defendant may "have compulsory process for obtaining witnesses in his [or her] favor[.]" *Kelly v. State*, 392 Md. 511, 532 (2006) (quoting *Washington*, 388 U.S. at 15). Compulsory process allows a defendant to call witnesses to testify at trial and, if necessary, to use the subpoena power to compel testimony. Together, the rights to compulsory process, confrontation, and due process give the defendant a constitutional right to present relevant evidence.

Notably, however, the rights are not absolute. A defendant's

> right to present a defense, albeit fundamental, is nonetheless subject "to two paramount rules of evidence, embodied both in case law and in Maryland Rules 5-402 and 5-403. The first is that evidence that is not relevant to a material issue is inadmissible. The second is that, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

*Holmes v. State*, 236 Md. App. 636, 668 (2018) (emphasis omitted) (quoting *Taneja v. State*, 231 Md. App. 1, 11 (2016)). In applying these concepts to uphold a notice provision in a rape shield statute that resulted in the exclusion of evidence of the defendant's own past sexual conduct with the victim, the United States Supreme Court has observed that "'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Lucas*, 500 U.S. at 149 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *White*, 324 Md. at 640 (quoting *Lucas* with approval); *see also Utter v. State*, 139 Md. App. 43, 53 (2001) (concluding that defendant charged with attempted rape did not have constitutional right to introduce evidence of victim's propensity to offer sexual favors for cigarettes).

Rule 5-401 defines "relevant evidence" as that having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Irrelevant evidence is inadmissible. Md. Rule 5-402; *see e.g.*, *Simmons v. State*, 392 Md. 279, 300 (2006). Where evidence is relevant, a court may still exclude it, in accord with Rule 5-403, "if its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Newman v. State*, 236 Md. App. 533, 548 (2018) (emphasis omitted) (quoting Md. Rule 5-403).

The theory that Mr. Westley relies on to establish the relevance of evidence of Victim's prior sexual assault is sometimes referred to as the "sexual innocence inference" theory. *See* Clifford S. Fishman & Jeannine Rustad, *Child abuse cases: Admissibility on source of knowledge*, in 3 Clifford S. Fishman & Anne T. McKenna, Jones on Evidence § 19:60 (7th ed. 2020).

> The theory is based on the premise that because most children of tender years are ignorant of matters relating to sexual conduct, a child complainant's ability to describe such conduct may persuade the jury that the charged conduct in fact occurred. To demonstrate that the child had acquired sufficient knowledge to fabricate a charge against the defendant, the theory reasons, the court should allow the defense to offer evidence that the child acquired sexual experience with someone else before he or she accused the defendant.

Clifford S. Fishman, *Consent, Credibility, and the Constitution: Evidence Relating to a Sex Offense Complainant's Past Sexual Behavior*, 44 Cath. U. L. Rev. 709, 806 (1995). The argument that a child has alternative sources of knowledge is not always attached to an argument that the victim is fabricating charges, but it often is. *See, e.g.*, *State v. Oliver*, 760 P.2d 1071, 1074 (Ariz. 1988); *State v. Howard*, 426 A.2d 457, 462 (N.H. 1981); *State v. Clarke*, 343 N.W.2d 158, 162 (Iowa 1984).

No Maryland appellate court has previously addressed whether a defendant has a constitutional right to introduce evidence to rebut a child's presumed sexual innocence.

Other states' courts have split on the admissibility of such evidence, whether deciding on constitutional grounds, as an unenumerated specific instances exception under a rape shield statute, or based on the application of traditional rules of evidence. A minority of courts have ruled such evidence to be broadly admissible. In *State v. Howard*, for example, after upholding the constitutionality of the state's rape shield statute, 426 A.2d at 460-61, the New Hampshire Supreme Court determined that the defendant had a constitutional right to explore the 12-year-old victim's prior sexual experience based on the court's "belie[f] that the average juror would perceive the average twelve-year-old girl as a sexual innocent" and, therefore, would presume that the girl could not have described the incident at issue unless it had actually occurred, *id.* at 462. Notably, the court did not provide any support for its belief, nor did it provide any description of the victim's allegations against the defendant, other than to note that the charge was of statutory rape.[13] *Id.* at 458-49.

Similarly, in *State v. Jacques*, which involved five- and ten-year-old victims, the Maine Supreme Court observed that "[w]here the victim is a child . . . the lack of sexual experience is automatically in the case without specific action by the prosecutor. A defendant therefore must be permitted to rebut the inference a jury might otherwise draw that the victim was so naive sexually that she could not have fabricated the charge." 558 A.2d 706, 708 (Me. 1989); *see also State v. Carver*, 678 P.2d 842, 843-44 (Wash. Ct. App. 1984) (holding that defendant should have been permitted to introduce evidence of prior

---

[13] Although the court did not identify the victim's allegations concerning the defendant in that case, it did quote in detail the allegations concerning her prior sexual conduct that the defendant wanted to introduce, which included allegations of bestiality, incest, and prostitution. *Howard*, 426 A.2d at 458-59.

abuse of victims described as "little girls" "to rebut the inference that the only way two young girls would have knowledge of such sexual matters was because the defendant had sexually abused them as charged"); *Summitt v. State*, 697 P.2d 1374, 1375 (Nev. 1985) (holding that trial court erred in excluding evidence of the six-year-old victim's prior sexual experience offered "to show that the young victim had had prior independent knowledge of similar acts which constituted the basis for the present charge").

Other courts have generally rejected the admissibility of such evidence and, in doing so, have questioned the validity of the theory underlying it. For example, in *State v. Clarke*, the Iowa Supreme Court held that evidence that a "relatively young" complainant had previously engaged in oral sex was properly excluded. 343 N.W.2d at 162-63. The court held that the evidence was "at most, of very marginal probative value," and that "[i]t certainly does not constitute evidence whose probative value outweighs the substantial danger of unfair prejudice, confusion of issues, misleading of the jury, and invasion of complainant's privacy which . . . rape shield laws are designed to prevent." *Id.* at 163. Similarly, in *People v. Arenda*, the Michigan Supreme Court held that evidence of a child victim's prior sexual conduct with others was properly excluded because "[a] jury is unlikely to consider a witness's ability to describe sexual conduct as an independent factor supporting a conviction." 330 N.W.2d 814, 817-18 (Mich. 1982). The court observed that unlike the categories of evidence made admissible under rape shield statutes, a victim's source of knowledge "need not be acquired solely through sexual conduct," and could be explored through less prejudicial types of evidence. *Id.* at 818. Moreover, the court observed that the sexual innocence theory would likely be relevant only to very young

33

children, and that such children "are among the persons whom the [rape shield] statute was designed to protect." *Id.*

In contrast to these seemingly all-or-nothing approaches, most states have not categorically approved or disapproved the admission of evidence of prior sexual conduct under a sexual innocence theory but have held that such evidence must be considered on a case-by-case basis. For example, in *State v. Molen*, the Idaho Court of Appeals held that the trial court had properly excluded evidence of the eight-year-old victim's prior exposure to sexual conduct, which was offered to explain how she "would know so much about sex unless she had actually been molested." 231 P.3d 1047, 1050-51 (Idaho Ct. App. 2010). The Idaho court joined what it called "the vast majority of courts [that] have held that evidence of a child victim's prior exposure to sexual conduct may be relevant to show an alternative basis for the child's sexual knowledge," *id.* at 1052, and identified three factors to consider on a case-by-case basis in making that assessment: (1) "the age of the child," with "the probative value" of such evidence "ordinarily . . . inversely proportional to the child's age"; (2) "the degree of similarity between the acts of which the defendant is accused and the prior sexual activity to which the child was exposed"; and (3) "the interest of avoiding trauma to the child from subjection to cross-examination concerning a prior molestation," *id.* at 1052-53.[14] Notwithstanding the child's age and the prosecutor's introduction of testimony from her "mother from which the jury could have inferred that

---

[14] This third factor was identified but not at issue in *Molen* because the evidence the defendant sought to admit in that case was of the child's prior exposure to the sexual conduct of others, not sexual conduct involving the child victim. 231 P.3d at 1053.

the child was sexually uninformed," the court in *Molen* concluded that the evidence of prior exposure was not sufficiently similar to the allegations against the defendant to make the evidence relevant. *Id.* at 1053.

In *State v. Pulizzano*, the Wisconsin Supreme Court held that to establish a constitutional right to present "evidence of a child complainant's prior sexual conduct for the limited purpose of proving an alternative source for sexual knowledge," a defendant would be required to

> make an offer of proof showing: (1) that the prior acts clearly occurred; (2) that the acts closely resembled those of the present case; (3) that the prior act is clearly relevant to a material issue; (4) that the evidence is necessary to the defendant's case; and (5) that the probative value of the evidence outweighs its prejudicial effect.

456 N.W.2d 325, 335 (Wis. 1990). Applying those factors in that case, the court concluded that the trial court had improperly excluded evidence that the seven-year-old complainant had previously been sexually assaulted where the prior assault "involved acts similar to those alleged here"; "[t]he inference that [the victim] could not possess the sexual knowledge he does unless [the defendant] sexually assaulted the children greatly bolsters [the victim]'s allegations"; and the inference could only be rebutted by "establish[ing] an alternative source for [the victim]'s sexual knowledge." *Id.* at 329, 334-35.

And in *Commonwealth v. Appenzeller*, a Pennsylvania intermediate appellate court held that the trial court properly precluded a defendant from introducing testimony of prior sexual abuse of a three-year-old victim where no foundation was laid "that her knowledge of sexual techniques and nomenclature was derived from the contact with appellant and his co-conspirator." 565 A.2d 170, 171 (Pa. Super. Ct. 1989); *see also Oliver*, 760 P.2d at

35

1077 (creating two-prong test in which defendant must first prove that the victim had previously been exposed to a sexual act and then show that the prior sexual act was sufficiently similar to serve as a basis for present knowledge); *Commonwealth v. Ruffen*, 507 N.E.2d 684, 687-88 (Mass. 1987) (requiring defendant to prove relevance of prior sex crime before court may admit such evidence); *State v. Benedict*, 397 N.W.2d 337, 341 (Minn. 1986) (requiring trial courts to assess relevance and balance the probative value against unfair prejudice before admitting prior sex crimes evidence); *Woodruff v. State*, 518 So. 2d 669, 673 (Miss. 1988) (requiring relevancy determination from trial judge); *State v. Moton*, 749 P.2d 639, 644 (Utah 1988) (affirming exclusion of evidence where it was unnecessary because the victim "had already admitted to having a great deal of sexual knowledge").

We join the majority of state courts that have considered this issue in determining that when a defendant seeks to admit evidence of a victim's prior sexual conduct to dispel a presumption of sexual innocence, a court must assess on a case-by-case basis whether the exclusion of such evidence would violate the defendant's constitutional rights. In making that assessment, a court must first determine if the facts of the case actually give rise to a presumption of sexual innocence. In doing so, a court should consider, among other relevant factors, the age of the child, the maturity of the sexual behavior alleged, whether the child's allegations necessarily suggest sexual knowledge beyond what a child of that age would presumedly possess, whether the State has introduced evidence suggestive of sexual innocence, and whether there is other evidence that the victim possessed sexual knowledge before reporting the conduct at issue. A court should not

presume sexual innocence merely because the complainant is a minor. If the minor's allegations do not suggest sexual knowledge that is necessarily beyond the child's age and the State has not introduced evidence suggesting sexual innocence, then evidence introduced to counter such a presumption is irrelevant and must be excluded.

If a court determines that the facts of the case would give rise to a presumption of sexual innocence, the court must then determine whether the proffered evidence actually rebuts the presumption. Doing so requires a comparison between the allegations of the prior sexual activity and those involved in the case at hand. If the comparison does not reflect sufficient similarity such that the prior conduct would dispel a presumption of sexual innocence, then the evidence of the prior conduct would not rebut the presumption and should be excluded as irrelevant.

Finally, the court must assess whether "the inflammatory or prejudicial nature of the evidence . . . outweigh[s] its probative value[.]" Crim. Law § 3-319(b)(3). In making that determination, a court should consider, among other relevant factors, the proximity in time between the prior sexual conduct and the complainant's allegations; whether the presumption can be rebutted in other, less prejudicial ways; if not, whether the evidence of prior sexual conduct can be presented through means other than cross-examination of the complainant; and, if not, whether reasonable limits on cross-examination can be imposed to protect the complainant while protecting the defendant's constitutional rights. *See Hall v. State*, 233 Md. App. 118, 133 (2017) ("The defendant's right to cross-examine is not limitless, and '[a] trial court may impose reasonable limits on cross-examination when necessary for witness safety or to prevent harassment, prejudice, confusion of the issues,

and inquiry that is repetitive or only marginally relevant.'" (alteration in original) (quoting *Martinez v. State*, 416 Md. 418, 428 (2010))).

Returning to Mr. Westley's case, we have no difficulty in concluding that the circuit court did not err in determining that the evidence of prior abuse was irrelevant because the facts of this case did not give rise to a presumption of sexual innocence. Victim was 12 years old at the time of the abuse by Mr. Westley and her allegations were of basic sexual conduct, including that Mr. Westley touched her private parts with his hands, mouth, and penis, and that white "stuff" came out of his penis. Mr. Westley did not present any basis of support for his claim that an ordinary juror would presume that a 12-year-old child would lack sufficient sexual knowledge to describe such actions, nor did the State introduce any evidence to suggest that this particular 12-year-old would lack such knowledge.

Although there may be an age at which such a presumption could arise without additional proof, we find no fault in the motions court's assessment that a jury would be aware that there are other sources from which a 12-year-old could have obtained such rudimentary sexual knowledge. Children are routinely taught that touching private body parts is inappropriate and should be reported, school-based sexual education programs provide relevant information,[15] and many 12-year-old children have access to ubiquitous mass and social media containing sexual content.[16] *See Commonwealth v. Rathburn*, 532

---

[15] Maryland regulations require each county's public schools to offer an elective education program addressing, among other topics, "family life and human sexuality." COMAR 13A.04.18.01.D.

[16] In ruling on the motion in limine, the circuit court colorfully expressed this reality in remarking that Victim's sexual knowledge just as plausibly came "from Instagram, like all the other 12-year-olds out there in the world at this point."

N.E.2d 691, 695-97 (Mass. App. Ct. 1988) (affirming preclusion of evidence of prior sexual abuse of child who was 10 and 11 years old at the time of the offenses and 13 years old at the time of trial, in part because her testimony "did not demonstrate 'extraordinary knowledge' of sexual acts or sexual matters in general"); Christopher B. Reid, Note, *The Sexual Innocence Inference Theory as a Basis for the Admissibility of a Child Molestation Victim's Prior Sexual Conduct*, 91 Mich. L. Rev. 827, 852 n.138 (1993) (citing studies suggesting that most children begin to mature physically at about age twelve). And although the motions court properly made its decision preliminary, subject to reopening at trial if the State presented evidence suggestive of sexual innocence, no such evidence was introduced.[17] As a result, the motions court's exclusion of the evidence was not erroneous.

---

[17] Mr. Westley does not point to any evidence the State introduced that was suggestive of Victim's sexual innocence, but he does argue that the State made such an argument in closing. Specifically, Mr. Westley highlights the prosecutor's statement that it was "powerful" and "telling" that Victim was able to specify details, such as the appearance of Mr. Westley's penis and ejaculate, "on her own at the age of 12," given that "a lot of children" would not be able to do so. For several reasons, that argument is unavailing. First, to the extent Mr. Westley now argues that the prosecutor's statement was improper, he failed to object at trial or raise the issue in his motion for a new trial and so has not preserved any such claim for appeal. *See* Md. Rule 4-323(a). Second, to the extent Mr. Westley argues that the prosecutor's statement in closing somehow retroactively validated his argument for admission of evidence of prior sexual conduct, that is not the way the rules of evidence operate. If the prosecutor were making an incorrect argument based on the evidence presented at trial or referring to evidence not in the record, the proper remedy would have been to object; ask that the comments be struck or a curative instruction be given; or, if too egregious to be cured, seek a mistrial. But such a comment in closing does not reverse time and alter the correctness of an earlier evidentiary ruling. Third, in context, it appears that the prosecutor was not invoking a sexual innocence argument but instead was commenting on Victim's credibility based on her forthright statements without needing to be "le[d] . . . through the interview" with Ms. Fleming. That, perhaps, explains the absence of a contemporaneous objection. And fourth, evidence concerning Victim's allegations about her prior sexual abuse by Mr. Quails would not, in any event, have been

39

Even if we concluded that Mr. Westley had identified a presumption of sexual innocence, and assuming for purposes of analysis that the allegations of the two incidents were sufficiently similar so as to offer some probative value, we would hold that the motions court did not abuse its discretion in concluding that any probative value was outweighed by the inflammatory and prejudicial nature of the evidence. We have already explored the significant prejudice attendant to introducing evidence of a victim's past sexual abuse, as well as the public policy interest in protecting victims from such trauma, which is reflected in the Rape Shield Statute. *See White*, 324 Md. at 634 (identifying testimony of past sexual conduct as "inva[sive of] the victim's privacy" and "traumatic to the victim of sexual abuse" (quoting *Goodson v. State*, 566 So. 2d 1142, 1150 (Miss. 1990)). An additional risk of unfair prejudice is that the jury might have unreasonably concluded that Victim was inherently less credible because she had made multiple allegations of sexual abuse.[18] *See generally* Reid, *supra*, at 856-59 (discussing the prejudicial effect of such evidence on the jury's assessment of a child victim's credibility).

---

relevant to rebut her testimony about white "stuff" coming out of Mr. Westley's penis, as the proffer concerning her allegations about the prior abuse did not contain that element.

[18] To the contrary, studies have concluded that victims of child sexual abuse are *more* likely to be victims of subsequent sexual abuse than those who have not previously been victims. *See, e.g.*, Samantha L. Pittenger et al., Predicting Sexual Revictimization in Childhood and Adolescence: A Longitudinal Examination Using Ecological Systems Theory, 23 *Child Maltreatment* 137, 137 (2018) (stating that child sexual abuse "victims are at an increased risk for subsequent sexual victimization throughout the life span," including "within childhood or adolescence"); Natalia D. Tapia, Survivors of Child Sexual Abuse and Predictors of Adult Re-victimization in the United States: A Forward Logistic Regression Analysis, 9 *Int'l J. Clinical Just. Scis.* 64, 65 (2014) (available online at http://www.sascv.org/ijcjs/pdfs/Tapiaijcjs2014vol9issue1.pdf) (noting a study concluding that sexual assault survivors "stand a 35 times greater chance of sexual assault than non-victims").

That heightens the already significant risk of jury confusion inherent from injecting into a sexual abuse trial unrelated allegations of sexual abuse of the same victim by a different perpetrator. *See White*, 324 Md. at 634 (noting that one purpose of rape shield statutes is to preclude testimony that would unreasonably "deflect[] the jury's attention from the true issue" (quoting *Goodson*, 566 So.2d at 1150)).

For all these reasons, we hold that the trial court did not err, abuse its discretion, or violate Mr. Westley's constitutional rights by excluding evidence of Victim's prior sexual abuse.[19]

### III. THE STATE DID NOT OPEN THE DOOR AT TRIAL TO PRIOR ABUSE EVIDENCE.

Mr. Westley argues that even if the motions court did not err in excluding evidence of Victim's prior abuse before trial, the trial court twice erred in continuing to exclude it. First, Mr. Westley contends that the State opened the door to evidence of Victim's prior sexual abuse when Victim testified that she had previously met Ms. Fleming at the CAC and the State asked, but then promptly withdrew, a question about when they had previously met.

The opening the door doctrine "offers relief when 'one party introduces evidence that was previously irrelevant, over objection, and in doing so, makes relevant an issue in the case,' permitting the trial court to determine that the first party 'opened the door' for the second party to offer evidence in response[.]" *In re J.H.*, 245 Md. App. 605, 640 (2020)

---

[19] Based on our foregoing analysis of relevance and prejudice, our ultimate decision would be the same even if we had concluded that the Rape Shield Statute did not apply.

41

(quoting *State v. Heath*, 464 Md. 445, 467 (2019)). Notably, however, the responsive evidence must have been rendered relevant by the evidence that purportedly opened the door. "The doctrine does not allow, for example, 'injecting collateral issues into a case or introducing extrinsic evidence on collateral issues.'" *Heath*, 464 Md. at 459 (quoting *Clark v. State*, 332 Md. 77, 87 (1993)). Moreover, a court may still exclude "'inadmissible responsive evidence' . . . when its[] evidentiary value is surpassed by its 'danger of unfair prejudice, [tendency to confuse] the issues, or mislead[] the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.'" *In re J.H.*, 245 Md. App. at 641 (second alteration in original) (quoting *Clark*, 332 Md. at 87); *see also* Md. Rule 5-403. We review without deference whether an action taken at trial has triggered the opening the door doctrine. *Heath*, 464 Md. at 457-58. If the State did open the door, we review the court's decision as to the responsive evidence's admissibility for an abuse of discretion. *Id.* at 458.

The relevant episode occurred during the State's direct examination of Victim. After Victim testified that Mother took her to see Ms. Fleming at the CAC following the alleged incident with Mr. Westley, the prosecutor asked whether that was the first time she had met Ms. Fleming. Victim responded that it was not. The prosecutor then asked when they had met previously but promptly struck the question.[20]

---

[20] In his appellate brief, Mr. Westley claims that Victim had answered the prosecutor's second question before it was struck. The transcript does not reflect an answer, and, in any event, Mr. Westley does not identify what answer was purportedly given. Without basis to doubt the integrity of the transcript, we must assume it is accurate.

Mr. Westley did not object to either question or to Victim's response to the first one. During cross-examination, however, he argued that the questions had opened the door for him to inquire as to the reason for Victim's prior meetings with Ms. Fleming. The court ruled that the reference was too fleeting and inconsequential to permit a full inquiry into the previous event. Mr. Westley now contends that Victim's remarks opened the door because, without further inquiry, the jury was permitted to speculate that the prior meeting might have concerned additional wrongdoing by Mr. Westley, particularly as the jury had already heard that CAC's services involved "treating and prosecuting victims of child abuse, sex abuse, and neglect."

As an initial matter, we observe that Mr. Westley's argument is not that Victim's testimony opened the door to evidence of the prior assault by suggesting a need to rebut a suggestion of sexual innocence. Instead, his argument is premised on the fundamentally different notion that the jury may have presumed that Victim had previously been sexually assaulted by Mr. Westley. With that in mind, we agree with the trial court that the State's testimony did not open the door. The transcript supports the trial court's conclusion that Victim's acknowledgment that she had met Ms. Fleming previously was fleeting and unlikely to have caught the jury's attention. The response also did not implicate Mr. Westley in any way. As a result, nothing beyond sheer speculation supports his contention that the jury might have concluded from it that Victim had previously made allegations of sexual abuse by Mr. Westley. That is especially so because jurors had already heard testimony that the CAC provided many types of child protective services, as well as therapeutic aid and medical care, and that Ms. Fleming spent only about a quarter

43

of her time on child sexual abuse. In short, Victim's testimony that she had met Ms. Fleming previously did not make relevant testimony about the reason for those previous meetings.

The second incident Mr. Westley argues justified admission of evidence of Victim's prior assault is premised on the doctrine of verbal completeness. Mr. Westley contends that when the court admitted a redacted video and transcript of a CAC interview, which contained unexplained references to Victim previously meeting with Ms. Fleming, he should have been permitted to admit unredacted versions of those exhibits under the doctrine of verbal completeness.

In certain circumstances, the doctrine of verbal completeness allows a party to respond to an opponent's entry of a writing or conversation "by admitting the remainder of that writing or conversation." *Conyers v. State*, 345 Md. 525, 541 (1997). Three requirements apply to any evidence admitted as an additional part of a document under that the doctrine: "[1] No utterance irrelevant to the issue is receivable; [2] No more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part, is receivable; [and 3] The remainder . . . merely aids in the construction of the utterance as a whole[.]" *Id.* at 541-42 (quoting *Feigley v. Baltimore Transit Co.*, 211 Md. 1, 10 (1956)). "Determining whether separate statements are admissible under the doctrine of verbal completeness is . . . to be reviewed for an abuse of discretion." *Otto v. State*, 459 Md. 423, 446 (2018). "Of course, parts of the conversation having no reference whatever to the issue upon trial are not admissible under the rule[.]" *Grove v. State*, 185 Md. 476, 479 (1946) (quoting *People v. Bowen*, 135 N.W. 824, 827 (Mich. 1912)).

The ostensibly incomplete statements in the redacted video and transcript on which Mr. Westley relies consist of generic references by Ms. Fleming: (1) indicating prior familiarity with Victim, including stating that Victim looked "taller since the last time," asking, "How old are you now?," and remarking that Victim was "living in Salisbury" the last time they had talked; and (2) suggesting Victim's prior familiarity with the facility, including asking if Victim "remember[ed] the room has cameras" and stating that the CAC "got new pretty markers." Notably, Mr. Westley did not object to including any of these references in the redacted versions of the video and the transcript, nor did he ask for those references to be redacted. Instead, he argued that their inclusion opened the door for him to introduce the unredacted video and transcript, including the discussion of Victim's prior abuse by Mr. Quails. The court denied Mr. Westley's motion to admit unredacted exhibits and later sustained the State's objection when Mr. Westley attempted to cross-examine Ms. Fleming about those prior meetings. Mr. Westley argues that the court erred in both rulings.

We discern no abuse of discretion in the trial court's determination that the doctrine of verbal completeness did not require admission of unredacted versions of the video and transcript. Ms. Fleming's general references to prior familiarity with Victim did not suggest abuse by Mr. Westley, and the introduction of evidence of prior abuse by Mr. Quails was therefore unnecessary to explain them. Furthermore, otherwise inadmissible evidence may be allowed pursuant to the doctrine of completeness only "if it is particularly helpful in explaining a partial statement *and* that explanatory value is not substantially outweighed by the danger of unfair prejudice, waste of time, or confusion."

45

*Otto*, 459 Md. at 452 (emphasis added). As we have already explained, the danger of unfair prejudice and confusion from introduction of the prior abuse evidence was significant.

For these reasons, we conclude that the trial court did not err or abuse its discretion in declining to admit evidence of Victim's prior sexual abuse at trial under the opening the door doctrine or the doctrine of verbal completeness.

## IV. THE EVIDENCE WAS SUFFICIENT FOR A TRIER OF FACT TO CONCLUDE THAT MR. WESTLEY HAD TEMPORARY RESPONSIBILITY FOR SUPERVISION OF VICTIM.

Mr. Westley's final contention is that the evidence was insufficient to convict him of sexual abuse of a minor based on the modality requiring that he "ha[d] . . . temporary care or custody or responsibility for the supervision of a minor[.]" *See* Crim. Law § 3-602(b)(1). For purposes of that offense,

> responsibility for supervision of a minor child may be obtained only upon the mutual consent, expressed or implied, by the one legally charged with the care . . . . [A] parent may not impose responsibility for the supervision of his or her minor child on a third person unless that person accepts the responsibility[.]

*Ellis v. State*, 185 Md. App. 522, 543-44 (2009) (quoting *Pope v. State*, 284 Md. 309, 323-24 (1979)).

The determination of "whether a person has responsibility for the supervision of a minor is a question of fact for the jury to determine." *Harrison v. State*, 198 Md. App. 236, 243 (2011). On appeal, this Court "review[s] the evidence in the light most favorable to the prosecution and determine[s] whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Perry v. State*, 229 Md. App. 687, 696 (2016) (quoting *State v. Smith*, 374 Md. 527, 533 (2003)). The standard of review

46

for legal sufficiency of evidence is not demanding. *See McKenzie v. State*, 407 Md. 120, 136 (2008) (asking whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))). We "must give deference to all reasonable inferences the fact-finder draws, regardless of whether we would have chosen a different reasonable inference." *State v. Suddith*, 379 Md. 425, 430 (2004).

Mr. Westley contends that the evidence at trial was insufficient to demonstrate beyond a reasonable doubt that he consented to supervise Victim either expressly or impliedly. We disagree. The record, viewed in the light most favorable to the State, establishes that Mr. and Ms. Westley took Victim and her four siblings into their care for two weeks while Mother and her husband were incarcerated. Mother testified that she asked her sister if she and Mr. Westley would watch the children; Ms. Westley consulted with Mr. Westley before saying yes; the couple agreed to have the children in their home; and Mother expected Mr. and Ms. Westley to provide food for the children while caring for them. Victim testified that on the first day of her stay with the Westleys, it was Mr. Westley who picked her up from school. Brother testified that Mr. and Ms. Westley would both take him to the park during their stay. And Ms. Fleming testified that when the abuse was first reported, Mother "had confirmed that Mr. Westley and his wife . . . had watched the children for a two-week period while she was incarcerated."

The evidence was sufficient for a jury to conclude that Mother had voluntarily entrusted both her sister and Mr. Westley with the care and supervision of Victim and that Mr. Westley had at least implicitly consented to the arrangement. Although there was other

47

testimony that could potentially have supported a conclusion that only Mother's sister accepted supervision of the children, "[i]t is 'the jury's task to resolve any conflicts in the evidence and assess the credibility of witnesses.' . . . In so doing, the jury 'can accept all, some, or none of the testimony of a particular witness.'" *Correll v. State*, 215 Md. App. 483, 502 (2013) (quoting *Allen v. State*, 158 Md. App. 194, 251 (2004)). Accordingly, we will affirm Mr. Westley's conviction for child sexual abuse based on the modality of responsibility for supervision of a minor. *See* Crim. Law § 3-602(b)(1).

**JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**